PER CURIAM.
William Frances Silvia was convicted of the September 22, 2006, first-degree murder of his estranged wife, Patricia Silvia, and the attempted first-degree murder of Patricia’s mother, Betty Woodard. Silvia seeks review of his conviction and sentence of death for the first-degree murder of Patricia. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. On appeal, Silvia raises six issues regarding the penalty phase leading to the imposition of the death sentence. However, because this Court has an obligation to review the sufficiency of the evidence in all death penalty cases, we review both the evidence of guilt as well as the penalty-phase issues raised. For the reasons set forth below, we affirm Silvia’s convictions and death sentence.
FACTS AND PROCEDURAL HISTORY
The Guilt Phase
The victim, Patricia Silvia, had been married to the defendant, William Frances Silvia, since 2002, but they separated in July 2006. At the time of the murder, Silvia was forty-one and Patricia was thirty-nine. After their separation, Patricia and two of her minor children from a previous marriage, Rachel and Ross, ages sixteen and thirteen, moved into the Winter Park home of her mother, Betty Woodard, and her stepfather, Patrick Woodard. Robin McIntyre, Patricia’s sister, also lived at the home. On several occasions prior to the evening of the murder, Silvia had visited the Woodard home unannounced in the middle of the night to speak to Patricia. Every time, Silvia was turned away.
On the day of the murder, Silvia was fired from his job. He had already become homeless after the separation, was living in his truck, and at times rented a motel room. That afternoon, after being fired, Silvia purchased a pump action twelve-gauge Mossberg 500 shotgun and ammunition and rented a motel room at the Regency Inn. Later that evening, the Woodards were hosting a cookout in their carport area. Those in attendance included Patricia, her children Ross and Rachel, her sister Robin, her parents, Patrick’s brother Jerome Woodard, and several other friends. At around 9 p.m., Silvia drove to the Woodard home with the shotgun and ammunition in his truck, apparently hoping to reconcile with Patricia.
When Silvia arrived at the home, he asked to speak with Patricia, who came outside to speak with him. They spoke briefly, after which Patricia went back into the house. As Patricia walked away, Rachel overheard Silvia tell Patricia, “You will be sorry.” Silvia walked back to his truck — a distance of approximately one hundred feet — retrieved his shotgun, and fired two shots as he walked back to the Woodard home.
At this point, Patrick’s brother, Jerome, who was in the carport at the time, jumped to the ground between two vehicles. After the shooting started, Patricia’s sister, Robin, left the carport and entered the home. Rachel, who was also in the carport, heard the gunshots and attempted to go into the house to find her brother, Ross. When Rachel got up to find her brother, Silvia pointed a gun at her from a foot away in the carport. At this point, Patricia and Betty were in the kitchen, adjacent to the carport. As Betty opened the door from the kitchen to the carport, she was shot in *964 the face. Patricia, who was getting iced tea out of the refrigerator, was also shot in the head, causing her to collapse in front of the refrigerator. Ross was standing near Patricia when she was shot.[1] Patrick Woodard, who was in the bedroom when he first heard gunshots, left the bedroom to check on things and saw Patricia lying on the floor in front of the refrigerator door. Patrick then looked outside the open door to the carport and saw Betty on the floor bleeding and covering her face. Patrick saw Silvia at the end of the carport holding a twelve-gauge shotgun, pointing the shotgun at Patrick and pumping it.
Silvia fired a total of seven shots at the scene that evening, two shots into the air and the other shots at the Woodard carport and home, and then left in his truck. During the shooting, Silvia shot Patricia and Betty. Patricia died at the scene. Betty, who was shot in the face, was airlifted by helicopter to Orlando Regional Medical Center in “grim” condition with massive facial and head trauma and blood loss.
According to the medical examiner, Patricia had numerous pellet gunshot entry wounds on her head. There was a pellet gunshot entry wound behind her left ear which entered her skull. A “big pellet” entered through the top of Patricia’s left ear, pierced her skull, and stopped in the right front lobe of her brain. There were additional pellet wounds on the back of Patricia’s head, resulting in massive trauma. Either the pellets or bone fragments caused exit wounds. The medical examiner concluded that Patricia died as a result of the shotgun pellet wounds to her head.
Police later arrested Silvia in the parking lot of the motel where Silvia had rented a room. While no evidence established that Silvia was intoxicated at the time of the murder on September 22, 2006, during his arrest in the early morning hours of September 23, 2006, Silvia appeared intoxicated or impaired.[2] During his transport to the Seminole County Sheriffs Office, Silvia confessed to the shooting. He asked the officer transporting him whether the officer was married and indicated that “he was in the situation” because he was married. Silvia admitted to shooting Patricia because she spent all of their money and then started dating her ex-husband.
Law enforcement officers later obtained a search warrant for Silvia’s motel room and truck'. In his motel room, they found a pump action twelve-gauge Mossberg 500 shotgun, shotgun shells, weapons manuals, and several empty beer bottles, among other items. The shotgun shells collected from Silvia’s motel room were the same brand as those collected at the crime scene. A firearms analyst examined and test-fired the shotgun found in Silvia’s motel room and concluded that the shells collected at the crime scene were fired from the same shotgun.
The jury found Silvia guilty of one count of first-degree murder for the murder of Patricia and one count of attempted first-degree murder for the shooting of Betty.
The Penalty Phase
Both the State and Silvia presented evidence at the penalty phase. The State presented two witnesses, Beth Parker and Patrick Woodard, who testified about what *965 they observed on the night Silvia killed Patricia. A victim advocate read victim impact letters written by Patricia’s children, Ross, Rachel, Ronny, and Randy, and her coworker, Aura Boyd. Patricia’s sister, Pam Wyatt, also testified.
Silvia presented two penalty phase witnesses — his father, William Silvia, Sr. (William), and Dr. Deborah Day, a psychologist. William testified that the relationship between himself and Silvia’s mother was very volatile, characterized by both verbal' and physical fighting, which Silvia witnessed. As a child, Silvia played little league baseball and was on a swim team, but was quiet and a loner with few friends. Silvia ran away several times as a teenager. During one such incident, Silvia attempted to rob a bank with his brother John, was arrested, and subsequently spent time in the psychiatric unit of the Florida Hospital.
William further testified that Silvia’s mother was killed by a drunk driver in 1999 or 2000. Silvia was greatly affected by his mother’s death because they worked together in his mother’s screen business, and Silvia was therefore unemployed after she died. In 2001, Silvia’s brother John died of a drug-induced heart attack. After the death of her mother, Silvia’s sister was classified as being bipolar and placed in a psychiatric ward.
Dr. Day, a forensic psychologist, evaluated Silvia at the request of defense counsel. Silvia smoked marijuana and drank alcohol since adolescence and eventually became alcohol dependent. Silvia’s father, William, was physically abusive to both Silvia and his mother, and Silvia’s family has a history of substance abuse and mental illness. During the time Silvia lived with Patricia, his second wife, he started having paranoid thoughts. However, Silvia showed no gross signs of brain injury or trauma, and he has an IQ of 107, which is considered average. In Dr. Day’s opinion, Silvia has “extreme” mental health problems. She found him to be very immature, alienated and impulsive, and suffering from significant levels of anxiety and depression. Dr. Day diagnosed Silvia with delusional disorder and personality disorder not otherwise specified, the latter of which included antisocial, schizoid, and paranoid elements.
Silvia told Dr. Day that on the day of the murder, he went to see Patricia, they talked, and then he went to the truck and got his shotgun. Silvia claimed that he did not remember anything else until he heard gunshots and that he did not remember leaving the residence. He did remember being back in his motel room. He went to talk to Patricia about whether they were going to reconcile or get a divorce. Silvia was suffering from paranoia that his wife was having an affair with her ex-husband and another man and that these people and others were out to get him. Dr. Day opined that it was more likely that Silvia would act out the way that he did due to his impulsiveness and alcohol abuse. When asked about Silvia’s alcohol consumption on the day of the murder, Dr. Day noted that the amount of alcohol Silvia consumed was not excessive for him given Silvia’s alcohol dependence. In Dr. Day’s opinion, Silvia had the mental capacity to premeditate the murder in a cold, calculated, and premeditated fashion. Although Dr. Day testified that Silvia’s ability to appreciate the criminality of his actions or to conform his conduct to the requirements of the law was not “substantially” impaired, she did state that it was “somewhat” impaired in that he has a “severe personality disorder,” is “impulsive,” was drinking alcohol, and has “false beliefs.”
The State called a psychiatrist, Dr. Jeffrey Danziger, as a rebuttal witness. Dr. Danziger conducted an evaluation of Silvia *966 and agreed with Dr. Day that psychological testing was consistent with “severe personality and character pathology.” Dr. Danziger described Silvia as:
Someone with a long-standing history of being suspicious of others, blaming others, sort of a hostile, irritable individual, suspicious, resentful, irritable, argumentative, perhaps often obnoxious. Someone who has difficulty with authority. Someone who likely has substance abuse issues. The profile was possibly consistent with someone who may have bizarre thinking and bizarre thoughts. It did not prove that he was psychotic....
On the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test, Silvia scored very high on the psychopathic deviant and paranoia scales.
Dr. Danziger further stated that while Silvia self-reported delusions and previous blackouts from drinking heavily, and that he drank a six-pack of beer before the murder, Dr. Danziger agreed that at the time of the murder, Silvia was not intoxicated. Moreover, Silvia’s jail records did not indicate paranoia, hallucinations, or psychosis. Dr. Danziger noted that when Silvia was in jail, without access to drugs or alcohol, he was not having delusions. However, on one occasion, a guard relayed to a nurse that Silvia was acting strangely and the nurse referred him to the jail psychologist for “hallucination anxiety.” The jail psychologist treated Silvia for depression and made a note to “rule out psychosis,” but subsequent to that incident, no records indicated that Silvia exhibited any other delusional thoughts.
Dr. Danziger agreed with Dr. Day’s diagnosis of personality disorder not otherwise specified, with antisocial and paranoid traits. Dr. Danziger thought it was “possible” that Silvia’s personality disorder had schizoid elements, but was not as certain as Dr. Day of this. In Dr. Danziger’s opinion, the antisocial characteristic was the prominent one. Dr. Danziger also agreed with Dr. Day that Silvia is alcohol dependent.
After the penalty phase, the jury recommended death by a vote of eleven to one.

The Spencer

[3]

 Hearing

At the Spencer hearing before the trial court, the defense presented the testimony of Dr. Daniel Buffington, a forensic pharmacologist, and the State again presented the testimony of Dr. Danziger. Dr. Buff-ington evaluated Silvia after the penalty phase. Dr. Buffington opined that Silvia was both alcohol — and marijuana — dependent. Silvia’s substance abuse would worsen or magnify the problems associated with Silvia’s personality disorders. Chronic alcoholism causes pathological changes in the brain, and therefore, in Silvia’s case, he need not be intoxicated to have impaired mental functioning.
Dr. Buffington testified that prior to the shooting, Silvia lost his wife, his job, and his home. He had a documented history of suicidal ideation at different times of peak stress. Silvia’s purpose in visiting with his wife was to reconcile as a foundation to keep on living, and if not, his goal was to commit suicide. Some of Silvia’s paranoia was fueled by past visits to' the Woodard home, where he was chased away by family members and threatened by his wife’s ex-husband and elder son. On the day of the murder, Silvia consumed a six-pack of beer, but Dr. Buffington testified that there were no signs of intoxication at the time of the murder and that this is not an “intoxication” case. Nonetheless, Dr. Buffington opined that Silvia was impaired in his ability to function and he could have been operating under a delusion. After losing his home and his job, the thought of *967 losing his marriage caused an extreme emotional disturbance.
In rebuttal, the State again called Dr. Danziger who testified that Silvia does not have a full-blown delusional disorder or paranoid delusions. Rather, he has paranoid personality characteristics. Dr. Dan-ziger testified that Silvia does not have a mental illness; instead, Dr. Danziger diagnosed him with a personality disorder. Silvia never stated that he purchased the gun to commit suicide and actually denied wanting to commit suicide.
The trial court followed the jury’s recommendation and imposed a sentence of death for the murder of Patricia. It imposed a sentence of life imprisonment for the attempted first-degree murder of Betty. The court found three aggravating circumstances — each of which it gave great weight. First, the court found that Silvia’s contemporaneous conviction for attempted murder for the shooting of Betty Woodard established the prior violent felony aggra-vator. Second, the court found that Silvia created a great risk of death to many persons. Third, the court found that the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (“CCP”). The trial court did not find any statutory mitigating circumstances,[4] but found several nonstatutory mitigating circumstances: (1) emotional distress from loss of job and wife (little weight); (2) impaired ability to conform conduct due to chronic personality disorder not otherwise specified and chronic alcohol dependence (moderate weight); (3) chronic personality disorder not otherwise specified with paranoid, antisocial, and schizoid features and alcohol dependence (moderate weight); (4) chronic alcohol dependence (moderate weight); (5) diagnosis as a teenager with “schizoid” or “schizophreniform” disorder (little weight); and (6) dysfunctional family setting when growing up with domestic violence (little weight).
ANALYSIS
In this direct appeal, Silvia raises six issues — all of which Silvia alleges relate to the penalty phase.[5] In addition to the issues raised by Silvia, this Court must consider whether the evidence was sufficient to support Silvia’s first-degree murder conviction. We now address each issue.
Guilt-Phase Issues Sufficiency of the Evidence
Silvia has not challenged the sufficiency of the evidence, but this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Jones v. State, 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(6) (“In death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate re *968 lief”). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
We conclude that the record contains sufficient evidence to support Silvia’s conviction for the first-degree murder of Patricia. The State presented evidence that Silvia confessed to the officer transporting him to jail that he shot Patricia because she spent all of their money and then started dating her ex-husband. This constituted direct evidence of Silvia’s guilt. See Simpson v. State, 3 So.3d 1135, 1147 (Fla.2009) (concluding that confession by appellant constituted direct evidence of guilt). Moreover, several witnesses, including Betty Woodard, Patrick Woodard, Jerome Woodard, and two of Patricia’s children, Rachel and Ross, all testified that Silvia was firing a shotgun near the carport of the Woodard home on the night in question, resulting in Patricia’s death. Evidence established that shells collected at the crime scene were fired from the shotgun found in Silvia’s motel room.
Based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons, 934 So.2d at 1111. Thus, there was sufficient evidence to support Silvia’s conviction for first-degree murder.

Penalty-Phase Issues

The Cold, Calculated, and Premeditated Aggravating Circumstance
Silvia first challenges the CCP aggravator. The trial court found that this aggravating circumstance had been proven beyond a reasonable doubt and gave it great weight. The trial court entered an order describing, in great detail, the basis for its findings:
The evidence is sufficient to establish that the murder of Patricia Silvia was the product of cool and calm reflection by the Defendant and not prompted by emotional frenzy, panic, or a fit of rage.... From the date of the separation until the evening of September 22, 2006, the Defendant came by the Woodard’s home several times and called on the phone to talk to Patricia Silvia, seeking to reconcile with her. Patricia Silvia was not receptive to the Defendant’s attempts to reconcile.
On September 22, 2006, at approximately 3:50 p.m., the Defendant purchased a 12 gauge Mossberg Persuader shotgun from Shoot Straight II. The surveillance video from Shoot Straight II shows the Defendant looking at the guns in the store, speaking with the store clerk, selecting the 12 gauge Moss-berg Persuader shotgun, purchasing the shotgun and leaving the store with the shotgun. This video is important because it shows the Defendant on the day of the murder calmly participating in a routine transaction. The Defendant exhibited no bizarre, agitated, frenzied or panicked behavior. The Defendant was calm the entire time he was at Shoot Straight II. He then went to Al’s Army Navy where he purchased four individual boxes of shells, including both bird and buck shot.
The Defendant rented a hotel room at the Regency Inn on Highway 17-92 in Fern Park that same afternoon and purchased a six-pack of beer at the nearby Winn-Dixie at 6:09 p.m. Approximately five and a half hours after purchasing the shotgun, the Defendant drove to the Woodard’s home with the shotgun and ammunition in his truck.
*969 Later that evening the Defendant went to the Woodard’s home to give Patricia Silvia one last chance to reconcile with him, and, if she refused, to kill her. When Patricia Silvia walked away from the Defendant after briefly speaking with him, Rachel Shadron heard the Defendant tell her mother, ‘You will be sorry.” The Defendant walked back to his truck, got his shotgun, and, as he walked back to the Woodard’s house, commenced shooting. The first shot was fired into the air and the next six shots were fired into the Woodard’s carport and house. After firing seven rounds and killing Patricia Silvia, the Defendant walked back to his truck and drove away.
There is no evidence that the Defendant was intoxicated at the time of the murder or at anytime on September 22, 2006. There is no evidence that the murder of Patricia Silvia, or any of Defendant’s conduct on September 22, 2006, was prompted by emotional frenzy, panic, or a fit of rage.
The Defendant was arrested in the early morning hours of September 28, 2006. The Defendant asked Sergeant Hardesty, the law enforcement officer driving him to the jail, if he was married. Sergeant Hardesty said, ‘Yes.” The Defendant then stated, “That’s the reason I’m in this situation. My wife spent all my money. I placed the checking account in her name. She started re-dating her ex-husband. That is the reason I shot her.” Sergeant Hardesty described the Defendant as lacking any type of emotion during his arrest and transport to jail. The evidence supports the “cold” element of the CCP aggravator.
The evidence is sufficient to establish that the Defendant had a careful plan or prearranged design to commit murder before the killing. Approximately five and a half hours before killing Patricia Silvia, the Defendant armed himself by purchasing the shotgun and shells used to kill her. He put the shotgun and shells in his truck when he went to the Woodard’s house that evening. The Defendant’s plan was to give Patricia Silvia one last chance to reconcile with him and, if she refused, to kill her.
When Patricia Silvia walked away from him that evening, Rachel heard the Defendant say to her mother, “You will be sorry.” He walked back to his truck. The Defendant could have gotten into his truck and driven away. No one followed the Defendant when he left the Woodard’s home. Instead, the Defendant calmly continued to carry out his plan to kill. The Defendant got his shotgun and walked back approximately one hundred feet to the carport, shooting as he walked, until he had a clear shot of Patricia Silvia. Then he shot her in the head.
The Defendant gave the mental health experts in this case different reasons for purchasing the shotgun on September 22, 2006. At first, the Defendant reported that he bought it for his own safety. He was sleeping in his truck and he said he needed the shotgun to protect himself. The Defendant had been homeless for some time prior to September 22, 2006. Then, he said he was afraid of the Woodard family. Yet, the Defendant did not take the shotgun with him the first time he went to the Woodard’s home. At some point, he reported he was afraid of Patricia Silvia’s ex-husband. Lastly, he told Dr. Buffington that he bought the shotgun to commit suicide. Neither Dr. Day nor Dr. Dan-ziger found the Defendant suicidal. The court rejects the Defendant’s inconsistent statements as to why he purchased the shotgun and finds the Defendant purchased the shotgun to kill Patricia Silvia.
*970 Patricia Silvia’s murder was neither spontaneous, nor impulsive. The killing of Patricia Silvia was carried out as a matter of course, consistent with the Defendant’s careful plan. The evidence supports the “calculated” element of the CCP aggravator.
(Footnotes omitted.) We conclude that there is competent, substantial evidence to support the trial court’s finding of this aggravator. See Barnhill v. State, 834 So.2d 836, 850-51 (Fla.2002) (“[T]he trial judge’s ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent, substantial evidence.... ”).
In order to establish the CCP aggravator, the evidence must show that (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)”; (2) “the defendant had a careful plan or prearranged design - to commit murder before the fatal incident (calculated)”; (3) “the defendant exhibited heightened premeditation (premeditated)”; and (4) “the defendant had no pretense of moral or legal justification.” Franklin v. State, 965 So.2d 79, 98 (Fla.2007). This can be established “by examining the circumstances of the killing and the conduct of the accused.” Id. “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’ ” Id. (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)). ‘“CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2000)).
Silvia first asserts that the killings were not the product of heightened premeditation or cool and calm reflection, but rather were actions prompted by his “emotional” and “domestic turmoil.” The trial court rejected this view of the crime, and we conclude that the trial court’s findings are supported by competent, substantial evidence. As to Silvia’s “heightened premeditation” claim, the record indicates that approximately five and a half hours before killing Patricia, Silvia armed himself by purchasing the shotgun and shells he used to kill her. The shotgun and shells were in his truck when he drove to the Woodard home that evening. When Silvia arrived at the home, he was not provoked by Patricia or anyone else. Further, when Patricia walked away from Silvia after speaking with him that evening, Silvia remarked, “You will be sorry,” and walked back to his truck — a distance of approximately 100 feet. Rather than getting into his truck and leaving the Woodard home, Silvia calmly chose the criminal option by retrieving the shotgun from his truck and returning to the carport, shooting as he walked — ultimately shooting both Patricia and her mother, Betty. As the trial court concluded, Silvia carried out the murder of Patricia as a matter of course, consistent with his careful plan — all of his actions reflecting a deliberate and conscious choice to commit murder. In light of this evidence, we conclude that the trial court did not err in finding the heightened premeditation needed to establish CCP.
Second, Silvia claims that because he has been diagnosed with a personality and delusional disorder, this diagnosis precludes a finding that he acted in a calm, reflective manner, as required by the CCP aggravator. This argument is likewise unpersuasive. We have held that a “defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or *971 prearranged design to commit murder, and exhibit heightened premeditation.” Evans v. State, 800 So.2d 182, 193 (Fla.2001); see also Owen v. State, 862 So.2d 687, 701 (Fla.2003) (relying on Evans to reject defendant’s claim that his mental illness must negate the CCP aggravator). Although there was certainly evidence of mental mitigation, the trial court rejected the mitigating circumstance that Silvia was under extreme emotional distress at the time of the killing.
Certainly, there have been cases where “we have determined that CCP was erroneously found because the heated passions involved were antithetical to ‘cold’ deliberation.” Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996). In this case, however, the trial court’s findings to the contrary are supported by the record. Although Patricia and Silvia had recently separated, and Silvia had visited the Woodard home to speak with Patricia on several occasions, the record lacks evidence showing the type of ongoing, highly emotional dispute needed to refute a finding of cool and calm reflection. See Santos v. State, 591 So.2d 160, 162-63 (Fla.1991).
In this case, despite Silvia’s personality disorder and alcohol dependence, his actions do not “suggest a frenzied, spur-of-the-moment attack.” Evans, 800 So.2d at 193. There is no evidence of impairment or intoxication at the time of the crimes. The evidence shows that Silvia calmly purchased a shotgun and ammunition. He rented a motel room and prepared for his confrontation with Patricia, even obtaining weapons manuals in addition to the shotgun and ammunition. He drove to the Woodard home and calmly talked to her, but when she said she would not reconcile, he walked back to his truck and got his shotgun. He fired seven shots, pumping the shotgun to reload it each time.
Accordingly, we find that the trial court did not err in finding CCP.
The Great Risk of Death to Many Persons Aggravating Circumstance
Silvia next challenges the trial court’s finding of the aggravator that Silvia knowingly created a great risk of death to many persons. The trial court entered an extremely detailed order explaining that Silvia’s discharge of the firearm multiple times put several people in the vicinity of the shooting at great risk of death. Silvia argues that there was not competent, substantial evidence to support this aggravator because his gunfire was intended for only one person — Patricia. He also claims that “the mere fact that several people are present during a shooting is not sufficient to support this aggravating factor.” Finally, he contends that for this aggravator to be established in a shooting crime, the evidence must show that many people were “in the line of fire” during the shooting and that this was not the case at the Woodard home on the night in question.
In Johnson v. State, 696 So.2d 317, 325 (Fla.1997), this Court explained what is required to establish the aggravator that a defendant “knowingly created a great risk of death to many persons”:
We have stated that this aggravator cannot be supported in situations where death to many people is merely a possibility. Instead, there must be a likelihood or high probability of death to many people. Further, we have indicated that the word “many” must be read plainly. Therefore, we uphold the application of this aggravating circumstance in scenarios in which four or more persons other than the victim are threatened with a great risk of death.
(Citations omitted.) It is with these guidelines in mind that we address, and reject, Silvia’s claims on this issue.
*972 Silvia first relies on Williams v. State, 574 So.2d 136, 138 (Fla.1991), in which this Court concluded:
First, the trial court found the factor of great risk to many persons based on the fact that several other persons were present in the bank at the time of the robbery. We believe this factual situation, without more, is insufficient to support this factor. This factor is properly found only when, beyond any reasonable doubt, the actions of the defendant created an immediate and present risk of death for many persons. While we agree that Williams’ actions created some degree of risk, we cannot say beyond a reasonable doubt that he created an immediate and present risk to the others in the bank. There is no evi- ■ dence, for instance, of indiscriminate shooting in the direction of bank customers, but only of an intent to kill the bank guard.
Silvia compares this case to Williams because the only intended victim was Patricia Silvia and “[t]he evidence is not clear on the number of people present at the carport when Silvia began shooting.” Silvia also compares this case to Alvin v. State, 548 So.2d 1112, 1115 (Fla.1989), in which this Court concluded that this aggravator was not met where only two other people were in the area but not “in the line of fire”:
We agree that the evidence does not support the finding that Alvin knowingly created a risk of death to many persons. The judge’s findings indicated that when the shooting took place there were four people in the vicinity, two of whom were Powell and Grimes. There were two women in the area, but they were not in the line of fire. We have previously held that the presence of two persons in the immediate proximity to the victim of a murder by shooting is insufficient to establish this aggravating factor.
Silvia contends that because only Betty and Patrick Woodard were in the line of fire, the four-person threshold required in Johnson is not met. We conclude, however, that both Williams and Alvin are distinguishable from the instant case. Although Silvia may have intended to kill only Patricia, there is competent, substantial evidence to support a finding that Silvia engaged in “indiscriminate shooting” in the direction of at least four persons other than Patricia who were not only put in “an immediate and present risk of death,” Williams, 574 So.2d at 138, but were also “in the line of fire,” Alvin, 548 So.2d at 1115.
As concluded by the trial court, “[n]ot counting the murder victim, the evidence is sufficient to establish that Betty Woodard, Patrick Woodard, Ross Shadron, Rachel Shadron, Jerome Woodard and Robin McIntyre were knowingly put in great risk of death by [Silvia].” Silvia concedes that Betty and Patrick Woodard were in the line of fire — Betty herself was shot and Silvia pumped the shotgun and aimed it at Patrick. There is competent, substantial evidence to support a conclusion that at least four persons in addition to Betty and Patrick were in the line of fire. Ross, Patricia’s twelve-year-old son, testified that when the shooting started, he was in the house and ran toward the door near the carport. Everyone was “just running in” through the open door. Ross was standing next to his mother, Patricia, as the others ran inside the house. Silvia shot at the door and Patricia fell directly in front of Ross. Rachel, Patricia’s daughter, testified that she was in the carport when she heard gunshots. She stood up to find her brother, Ross. Silvia was standing less than a foot away from Rachel when he pointed the shotgun at her. Additionally, Jerome Woodard, Patrick’s brother, was in the carport when he heard shots. He dropped to the ground and hid between *973 two vehicles. There was birdshot found in the car behind which Jerome hid and in a pillar in the carport near where he was located. Finally, there was evidence that Robin McIntyre, Patricia’s sister, was in the carport when the shooting started and ran into the house through the open carport door before Patrick closed it.
We therefore conclude there was competent, substantial evidence that Silvia’s actions created a great risk of death to many persons. He approached the house while pumping shells into his shotgun. Pellets hit one of the cars in the carport, different locations in the carport, and the door from the carport to the house. Pellets were found inside the house in the kitchen, dining room, and bedroom. There were six unarmed people in the carport and house when Silvia approached, shooting and pointing the gun at people.
Accordingly, we conclude that the trial court did not err in finding the great risk of death aggravator.
Proportionality of Death Sentence
Silvia next argues that the death penalty is a disproportionate punishment for the murder of Patricia. We deny relief on this claim.
The death penalty is “reserved only for those eases where the most aggravating and least mitigating circumstances exist.” Terry v. State, 668 So.2d 954, 965 (Fla.1996). Therefore, in deciding whether death is a proportionate penalty, the Court makes a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citation omitted). Accordingly, the Court considers the totality of the circumstances and compares the ease with other similar capital cases. See Duest v. State, 855 So.2d 33, 47 (Fla.2003). This analysis “is not a comparison between the number of aggravating and mitigating circumstances.” Porter v. State, 564 So.2d 1060,1064 (Fla.1990). Rather, this entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” Urbin v. State, 714 So.2d 411, 416 (Fla.1998). In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors. See Bates v. State, 750 So.2d 6, 12 (Fla.1999).
In this case, the jury recommended death by a vote of eleven to one for Patricia’s murder. The trial court found the following three aggravating circumstances: (1) prior violent felony; (2) CCP; and (3) knowingly creating a great risk of death to many persons. The trial court found no statutory mitigation, but found several nonstatutory mitigating circumstances, including the emotional distress from the loss of Silvia’s job and his wife, chronic personality disorder and alcohol dependence, and growing up in a dysfunctional family.
Silvia relies on Santos v. State, 629 So.2d 838 (Fla.1994), and White v. State, 616 So.2d 21 (Fla.1993), which are both cases with a single aggravator[6] and statutory mitigation. Silvia also relies on Farinas v. State, 569 So.2d 425, 431 (Fla.1990), in which this Court found a death sentence to be disproportionate:
On review of the record, we conclude that there was evidence which tended to establish that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. § 921.141(6), Fla. Stat. (1985). During the two-month period *974 after the victim moved out of Farinas’ home, he continuously called or came to the home of the victim’s parents where she was living and would become very upset when not allowed to speak with the victim. He was obsessed with the idea of having the victim return to live with him and was intensely jealous, suspecting that the victim was becoming romantically involved with another man. See Kampff v. State, 371 So.2d 1007 (Fla.1979). We find it significant, also, that the record reflects that the murder was the result of a heated, domestic confrontation. Wilson v. State, 493 So.2d 1019 (Fla.1986). Therefore, although we sustain the conviction for the first-degree murder of Elsidia Landin and recognize that the trial court properly found two aggravating circumstances to be applicable, we conclude that the death sentence is not proportionately warranted in this case.
As explained previously under the CCP analysis, although Silvia was going through a difficult time as a result of a domestic dispute with Patricia, the evidence showed, and Dr. Day opined, that he was not under the influence of an extreme emotional disturbance at the time of the murder. Thus, Farinas is inapposite. In addition, in later cases, we have specifically declined to recognize a “domestic dispute exception.” See Turner v. State, 37 So.3d 212, 224 (Fla.) (“[T]his Court made it clear in Lynch [v. State, 841 So.2d 362, 377 (Fla.2003) ] that it ‘does not recognize a domestic dispute exception in connection with death penalty analysis.’ ”), cert. denied, — U.S. -, 131 S.Ct. 426, 178 L.Ed.2d 332 (2010); Carter v. State, 980 So.2d 473, 485 (Fla.2008) (“Domestic situations are evaluated in the same manner as other cases.”).
We conclude that the death penalty is a proportionate punishment for the first-degree murder of Patricia Silvia. The CCP aggravator is one of the most serious aggravators set out in the statutory sentencing scheme. Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006). Similarly, the prior violent felony aggravator is considered one of the weightiest aggravators. Sired v. Moore, 825 So.2d 882, 887 (Fla.2002). In this case, the prior violent felony was attempted murder. Further, this case is proportionate to other cases with similar aggravating and mitigating circumstances. See Evans v. State, 838 So.2d 1090, 1097-98 (Fla.2002) (upholding the death sentence as proportionate after defendant killed his brother’s girlfriend during a fight and where the court found two aggravators (prior violent felony and on probation), no statutory mitigators, and five nonstatutory mitigators (little or some weight)); Floyd v. State, 850 So.2d 383, 392-93, 408-09 (Fla.2002) (determining that death sentence was proportionate after defendant killed mother-in-law and where there were three aggravators (avoid arrest, prior violent felony, and on probation), no statutory mitigators, and four nonstatutory mitigators (all little weight)); Robinson v. State, 761 So.2d 269, 272-73 (Fla.1999) (finding the death penalty proportionate where defendant killed his girlfriend and there were three aggravators (pecuniary gain, avoid arrest, and CCP), two statutory mitigators (extreme emotional distress (some weight) and ability to conform conduct to the requirements of the law (great weight)), and eighteen non-statutory mitigators).
Based on the specific facts and circumstances of the murder and the aggravators and mitigators found by the trial court in this case, we conclude that when compared with other capital cases, the death sentence in this case is proportionate.
Alleged Prosecutorial Misconduct
Under this issue, Silvia raises two separate arguments concerning alleged prose-cutorial misconduct — one concerning evidence of lack of remorse and the other *975 concerning comments about the testimony of Patrick Woodard. We address, and then reject, each argument in turn.

Lack of Remorse

Silvia first argues that the trial court erred in overruling his objections and denying his motion for mistrial when the State’s expert witness, Dr. Danziger, testified that Silvia lacked remorse for the murder of his wife. We conclude that a close examination of the record reveals that the trial court did not err with regard to its rulings on this issue.
During the direct examination of Dr. Danziger the following occurred:
Dr. Danziger: Then you take that MMPI data and say, well, does it fit what we know about this person? Let’s look at our interviews with him. Let’s look at other tests.... Let’s look at what people say about him. You put all of the pieces together. In this case, I believe that Dr. Day and I are in agreement that the MMPI-2 profile does accurately describe him.
Prosecutor: The 4 Scale did you call that the psychopathic deviancy and if so, can you explain what that is?
Dr. Danziger: The 4 Scale clinically means someone that may tend to violate the norms of society. Someone who does not respect authority, the end justifies the means and a lack of remorse. So the higher that you score on that scale, the stronger those characteristics.
(Emphasis added.) Defense counsel objected and moved for a mistrial, arguing that Dr. Danziger’s testimony improperly introduced evidence of lack of remorse in Silvia’s penalty phase. The State argued that the testimony was not improper because Dr. Danziger was talking generally about the score Silvia received on the MMPI. The trial court denied the motion for mistrial but instructed the State to have Dr. Danziger clarify his testimony to explain that just because an individual has a certain profile on the MMPI does not mean that they have all of the characteristics of the profile. The State complied.
Later during cross-examination of Dr. Danziger by defense counsel, when asked about the criteria of antisocial personality disorders, the following occurred:
Dr. Danziger: That in my opinion is yes. My understanding is that he had multiple jobs, evicted from homes, could not sustain employment. When he had money from his mother’s death, apparently blew through that money. Did not handle it properly. In my opinion, there is a history of irresponsibility in his work and financial life leading to some serious consequences.
Defense Counsel: And were there other criteria of these antisocial personality disorders that you observed in Mr. Silvia?
Dr. Danziger: Limited remorse. Not much remorse for what has happened or what has been done.
(Emphasis added.) Following this exchange, defense counsel again expressed concern that the witness raised the issue of lack of remorse and asked that the question be withdrawn and the answer stricken. The trial court granted the request and advised the jury to disregard the question and answer.
There is no question that lack of remorse is an improper aggravator. In Pope v. State, 441 So.2d 1078, 1078 (Fla.1983), this Court held:
[H]enceforth lack of remorse should have no place in the consideration of aggravating factors. Any convincing evidence of remorse may properly be considered in mitigation of the sentence, but absence of remorse should not be weighed either as an aggravating factor nor as an enhancement of an aggravating factor.
*976 See also Robinson v. State, 520 So.2d 1, 5-6 (Fla.1988) (vacating death sentence in part because the State impermissibly argued during closing argument that the defendant lacked remorse).
Unlike in Robinson, where the prosecutor stated in closing argument that the defendant lacked remorse, here the State did not attempt to introduce lack of remorse. Initially, the prosecutor was questioning Dr. Danziger regarding his diagnosis of antisocial personality disorder. Dr. Danziger first mentioned lack of remorse because, as he testified, showing little remorse is one of the diagnostic criteria for antisocial personality disorder.
Defense counsel objected to the first mention of lack of remorse. Following a sidebar, the response was clarified by the prosecutor when Dr. Danziger confirmed that when a profile is generated on a person from the MMPI-2, it does not necessarily mean that someone who is scored that way has all of those characteristics (e.g., lack of remorse). Further, after the second mention of lack of remorse by Dr. Danziger, which was elicited by defense counsel, the trial court, upon defense counsel’s request, struck the question and the answer and instructed the jury to disregard it.
“A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial. A trial court’s ruling on a motion for mistrial is subject to an abuse of discretion standard of review.” England v. State, 940 So.2d 389, 401-02 (Fla.2006) (citation omitted). The State never argued lack of remorse to the jury, and we conclude that in light of the trial courts actions in this case to address the objectionable testimony, the trial court did not abuse its discretion in denying the motion for mistrial.

Comments about Patríele Woodard

Silvia next argues that the trial court erred in overruling his objections when the State misstated evidence during its guilt phase closing argument suggesting that Silvia attempted to murder Patrick Woodard. In essence, Silvia asserts that this error during the guilt phase “tainted” the penalty-phase trial. Regardless of whether this issue should have been raised as a guilt-phase claim rather than a penalty-phase claim, we find that it lacks merit.
During the prosecutor’s closing argument in the guilt phase, he stated:
Patrick’s in the back master bedroom. He hears that shot and he comes around. And by the time he comes around, Patricia’s on the ground. That gun could fire that fast. And he climbs over Patricia and he is shutting that door. What does Rachel say? Grandpa, Patrick, was shutting that door. And we saw the pictures of the damage to the door, that buckshot was an angle, it wasn’t directly in, that buckshot was not shot when that door—
Defense counsel objected on the grounds that the prosecutor was misstating the evidence. The trial court overruled the objection, ruling that it would allow the jury to rely upon its collective memory. The prosecutor continued:
That buckshot, [the crime scene investigator] told you, she couldn’t do a spread on it because it was at an angle it wasn’t a true plane. So, Rachel says Patrick was closing the door. Patrick says he went over—
Defense counsel again objected on the grounds that the prosecutor was misstating the evidence. The trial court again overruled the objection, indicating that it would allow the jury to rely upon its memory. The prosecutor went on to state the following without objection:
*977 Patrick said that he went to close the door. What did he tell you? he saw Silvia pumping the gun. And he — if he didn’t close that door, I submit to you that he would have taken some buckshot.
Silvia claims that the trial court erred in overruling his objections because these statements were “highly inflammatory and not supported by the evidence.” [7] We disagree because the prosecutor’s statements were fair comments on the evidence. Attorneys are permitted wide latitude in closing argument, but that latitude does not extend to allowing improper argument. Gore v. State, 719 So.2d 1197, 1200 (Fla.1998). “The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.” Gonzalez v. State, 990 So.2d 1017, 1028-29 (Fla.2008) (quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985)). The following evidence was introduced during the guilt phase: Patrick Woodard testified he saw Silvia point the gun at him. Because he saw Silvia pump the shotgun as if to “tak[e] a round” at him, Patrick shut the door to prevent getting “hit in the chest.” Rachel also testified that when Patrick was kneeling down by the door, she could still hear gunshots. Further, there were two impact sites on the exterior of the carport door, behind which Patrick took cover. Thus, we conclude that the trial court did not err in overruling Silvia’s objections to these statements.
Even if there was any lack of clarity in Patrick Woodard’s guilt-phase testimony regarding his location, he removed any possible confusion on this issue when he clearly testified in the penalty phase that Silvia pointed the gun at him and then pumped it, after which Patrick shut the door as Silvia fired. Accordingly, we reject any claim that these guilt-phase closing arguments caused harmful error in the penalty phase.
Victim Impact Evidence
Silvia’s next argument is that the trial court improperly permitted inflammatory and improper victim impact evidence during the penalty phase. Because defense counsel failed to make specific objections to the content of the victim impact evidence, we reject this claim as not properly preserved for appeal.
At the beginning of the penalty phase, discussions were held concerning victim impact evidence, and it was determined that the victim advocate would read letters from Patricia’s children and her coworker. Before the letters were actually read to the jury, the defense attorney renewed a “general objection” to the victim impact evidence arid the trial judge acknowledged that the defense attorney could have a “standing objection.” The victim advocate then read the letters.
In Ross’s letter, he stated, “God needed another angel and he picked my mom.” He also stated, “I know that my mom is watching up above and she’s my Number 1 angel.” In Aura Boyd’s letter, she stated, “I have a lot [of] fear because this showed me it does not matter how you live your life if someone who does not see a value in a life wants to take it from you, they can for any reason they feel necessary just because they want money or your car, maybe they don’t want you to end a relationship with them or just because they can.”
*978 As an initial matter, we agree with the State that this issue is not preserved because there was no specific objection to the comments now cited as improper. In Wheeler v. State, 4 So.3d 599, 606 (Fla.2009), we explained:
During the entire presentation of victim impact evidence, Wheeler made no specific objections to any portion of the testimony or any particular aspect of the photographic evidence, although Wheeler renewed his general objection to presentation of any victim impact evidence. We conclude that the claim Wheeler now makes that the victim impact evidence was impermissibly made a feature of the penalty phase was not preserved by Wheeler’s general pretrial objections addressed to all victim impact evidence, where he made no specific objections to any of the evidence presented and failed to object below on the grounds argued here. It is well-established that for a claim “to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.” F.B. v. State, 852 So.2d 226, 229 (Fla.2003) (quoting Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982)).
Silvia did not object to the specific comments with which he takes issue on appeal. Silvia’s “standing objection” was based on a general objection to victim impact evidence and not to any specific statement in the letters. Defense counsel even stated that he had reviewed the letters and had come to an agreement with the State on the redaction of certain statements in the letters.
Because there was no specific objection, Silvia must establish that fundamental error or a violation of due process occurred in this case. See Wheeler, 4 So.3d at 607 (“In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.”) (emphasis removed) (quoting Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). We conclude that the statements cited by Silvia in the letters do not rise to the level of fundamental error or a violation of due process. Accordingly, we deny relief on this claim.
Constitutionality of Florida’s Death Sentencing Scheme Under Ring v. Arizona
In his final argument, Silvia contends that Florida’s death penalty statute is unconstitutional under the Sixth Amendment pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He acknowledges our precedent to the contrary. In any event, Ring does not apply to this case because one of the aggravating circumstances found by the trial court in this case was Silvia’s prior conviction for a violent felony — the contemporaneous conviction for the attempted murder of Betty Woodard. See Jones v. State, 855 So.2d 611, 619 (Fla.2003) (recognizing that the prior violent felony aggravator is “a factor which under Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] and Ring need not be found by the jury”). Therefore, we deny relief on this claim.
CONCLUSION
After a thorough review of all of the issues raised by Silvia, and after our own independent review of the sufficiency of the evidence, we affirm Silvia’s convictions and sentences.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. There is conflicting testimony concerning the location of Ross during this incident, but the trial court stated in its sentencing order that Ross was standing close to Patricia when she was shot.

. Two receipts were located in Silvia's motel room — each for a purchase of a six pack of beer dated September 22, 2006, at 6:09 p.m., and September 22, 2006, at 10:02 p.m. This indicates that one purchase was before the murder and one purchase was after the murder.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court considered the statutory mitigating circumstances of extreme emotional distress at the time of the killing and substantial impairment of ability to conform behavior to the requirements of the law, but found that they had not been established.

. Silvia argues: (1) the trial court erred in finding CCP; (2) the trial court erred in finding that Silvia knowingly created a great risk of death to many persons; (3) his death sentence is not proportionate; (4) the prosecutor’s repeated improper and inflammatory elicitation of irrelevant evidence tainted the penalty phase; (5) reversible error occurred when the trial court permitted improper victim impact evidence; and (6) Florida’s death sentencing scheme is unconstitutional under the Sixth Amendment pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. These cases were single-aggravator cases after this Court struck CCP in both cases.

. In his initial brief, Silvia contends that defense counsel objected to the prosecutor’s statement "And he — -if he didn’t close that door, I submit to you that he would have taken some buckshot.” However, it is clear that defense counsel did not object to this specific comment. Rather, defense counsel objected to the two previous comments.