PER CURIAM.
Hector Gabriel Sanchez-Torres, who was nineteen years old at the time of the crime, appeals his convictions for first-degree murder and armed robbery and the sentence of death imposed for the murder of nineteen-year-old Erick Joel Colon. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Sanchez-Torres’s convictions and sentence of death.
FACTS AND PROCEDURAL HISTORY
Sanchez-Torres pled guilty to first-degree murder and armed robbery. After he subsequently waived a penalty-phase jury, the State presented the following evidence regarding the crimes in this case during penalty-phase proceedings in front of the trial judge.
On the evening of September 9, 2008, Erick Joel Colon had been at a friend’s house playing board games and left at 11 p.m. to walk home. He had his cell phone with him at the time, as well as a wallet with cash in it.
Colon’s body was discovered lying on the sidewalk close to his home in the early morning hours of September 10, at 1:30 a.m. The area was very dark. When Colon’s body was discovered, his wallet and cell phone were missing.
Colon had been shot once in the head, but had no other injuries. The medical examiner testified that the characteristics of the gunshot wound indicated that the muzzle of the gun was in direct contact with, and pressed hard against, the skin. The entrance wound was just below the left eye, and the exit wound was on the right back side of the head.
On September 30, 2008, Colon’s mother testified that she received a phone call from her son’s number. When she answered, a young Hispanic woman was on the other end. Colon’s mother began crying and told the caller that the cell phone belonged to her murdered son. The caller hung up.
Sanchez-Torres’s younger sister, who was fifteen years old at the time of the crime, testified during the penalty phase that she had discovered the cell phone and recognized that it was not one of her brother’s cell phones. She found a contact listing for “mom” and called it. A woman answered. She was crying and explained that the cell phone belonged to her murdered son. Sanchez-Torres’s sister then hung up and called her mother, who told her to turn off the phone and wait for her to come home. Sanchez-Torres’s sister also called Marked Thomas, the codefen-dant in this case and Sanchez-Torres’s good friend and roommate, who told her to turn off the phone and pull out the battery, which she did. She gave the phone to Thomas, and her mother got it from him.
Detective Sharman with the Clay County Sheriffs Office spoke with Sanchez-Torres’s mother, Maria Torres, on October 1, 2008. Torres stated that she had found the phone and that her daughter had used the phone to call someone who said the phone belonged to her son. Torres stated that she had taken the phone from her daughter and had thrown it in the trash. At some point later, Torres told law enforcement that she had given the cell phone to someone who had destroyed it. The Clay County Sheriffs Office was then able to locate pieces of the phone.
On October 2, Detective Sharman visited Sanchez-Torres in the Duval County Jail to question him about the phone. Sanchez-Torres stated that Thomas had bought the phone from an acquaintance known as “D.” When informed that the phone belonged to a murder victim, Sanchez-Torres denied having anything to do *665 with the murder. The Clay County Sheriff’s Office was able to identify and locate “D,” who denied ever selling or giving Sanchez-Torres or Thomas a phone.
Detective West, also with the Clay County Sheriffs Office, testified that he spoke with Torres on March 5, 2009, when he interviewed her at her home. When he met with her, he informed her that he had drafted an arrest warrant for her for tampering with the cell phone and showed her an unsigned arrest warrant. Torres testified that the next day, she told Sanchez-Torres about what happened, and he told her to contact the detectives and tell them to come see him.
After Detective West received a phone call from Torres, in which she stated that Sanchez-Torres wanted to speak to him, Detective West proceeded to the Duval County Jail to interview Sanchez-Torres. During the initial part of the interview, Sanchez-Torres stated that Thomas had shot the victim and drew a diagram of the scene and the body to describe what happened. Detective West left the room, and Sanchez-Torres wrote out a three-page handwritten statement, in which he stated that he, and not Thomas, had shot the victim. Detective West returned to the room and took Sanchez-Torres to a different location in order to conduct a videotaped interview. Sanchez-Torres then told Detective West again that Thomas was the shooter.
The State also presented evidence regarding Sanchez-Torres’s prior violent felony, which was a murder that took place in Duval County on July 20 or 21, 2008, less than two months before the murder in this case. Sanchez-Torres had confessed to shooting the victim in the Duval County murder, stating that he shot the victim because the victim had repeatedly threatened to kill his then-pregnant girlfriend. Sanchez-Torres was tried and found guilty of first-degree murder in the Duval County case and was sentenced to life in prison in December 2009.
Finally, the State presented a victim impact statement from the victim’s mother. Presentation of defense witnesses was postponed until after the completion of codefendant Thomas’s trial, at which the same judge presided. Pursuant to his guilty plea in this ease, Sanchez-Torres was required to testify during Thomas’s trial.
The penalty-phase proceedings then continued in Sanchez-Torres’s case.[1] Sanchez-Torres presented mitigation evidence in the form of testimony from numerous witnesses consisting of his family, friends, friends of the family, former teachers and coaches, and supervisors and fellow employees at the dog track where he worked. They universally described Sanchez-Torres as a respectful, polite, good, kind, loving, caring, and giving person, who was also a “clown” and a “goofball.” Specifically, they described him as family-oriented; bright and intelligent; someone who was always quick to help in any way, including helping people financially, assisting others with moving, volunteering, providing transportation to others, and being there if someone needed to talk; someone who got along with others and made friends everywhere he went; and someone who loved animals. Several individuals testified that Sanchez-Torres believes in God and attended church on a regular basis as part of the youth group. Witnesses also testified that Sanchez-Torres *666 was a civic-minded individual who volunteered often at Hispanic heritage events.
Growing up, Sanchez-Torres played baseball. He was a very good baseball player and made the all-star team. He got along well with the other players and the coaches and was a team player. One of Sanchez-Torres’s dreams was to play professional baseball.
A former high school teacher testified that Sanchez-Torres would meet her early in the morning so that he could study or do homework in her room in the mornings while she got ready for the day. He was a good student, and his grades improved while he was in her class. He tried out for the baseball team, but was “crushed” when he did not make the team.
When Sanchez-Torres was fifteen years old, his parents got divorced based on problems caused by his father’s gambling and drug and alcohol abuse problems, which his parents had kept from him. His mother testified that Sanchez-Torres was angry about the divorce. After the divorce, Sanchez-Torres’s father moved to Connecticut. Sanchez-Torres then moved to Connecticut to be with his father, but only stayed for a short period of time upon discovering his father’s gambling and drug abuse problems and after being disappointed that his father did not spend time with him. Sanchez-Torres then moved back to Jacksonville to live with his mother and younger sister.
Shortly thereafter, when Sanchez-Torres was sixteen years old, his father died as a result of problems caused by the alcohol and drug abuse. Sanchez-Torres’s mother testified that Sanchez-Torres was “devastated” by his father’s death. One of Sanchez-Torres’s aunts testified that Sanchez-Torres’s father’s death was “very hard for him.” Sanchez-Torres did not pass the FCAT and therefore was unable to graduate from high school,[2] which was stressful to him.
Sanchez-Torres started working at the dog track when he was in high school and was still employed there the day of the murders. His fellow employees and his supervisors at the dog track universally described him as a good employee who took his work seriously and was quickly promoted because he was respectful, professional, and had no issues with attendance. He came in on his days off if someone called in sick and supervised eight other employees. He was known as a reliable employee and someone people could count on. He also frequently gave other employees rides to work.
Sanchez-Torres’s girlfriend became pregnant, and his mother testified that Sanchez-Torres was very happy and excited about being a father. However, Sanchez-Torres’s high school teacher testified that he had “mixed feelings” because being a parent was also a lot of responsibility. His girlfriend gave birth shortly before the murder in this case.
Several individuals testified that Sanchez-Torres would give or lend them money. He worked overtime at the dog track because he was trying to help his mother with the rent, as well as make payments on his new car that he had bought. He also felt that because he was going to be a father, he needed to make more money. About a month before the murder in this case, Sanchez-Torres moved out of his mother’s apartment into an apartment downstairs with the codefendant, Thomas.
Sanchez-Torres also presented testimony from his former counsel in this case, who had represented him for a short period of time. She testified that Sanchez-Torres was a “model client” who was al *667 ways pleasant, personable, and cooperative. She suggested that Sanchez-Torres take a polygraph test, and Sanchez-Torres submitted to a polygraph examination without hesitation.
Sanchez-Torres also presented testimony from the polygrapher who conducted his polygraph examination. The polygra-pher asked Sanchez-Torres whether he had shot the victim, to which Sanchez-Torres answered that he did not. Sanchez-Torres passed the polygraph test with a score that was “very, very good.”
Finally, Sanchez-Torres read a statement in which he apologized to the victim’s family, stating that he could not “apologize enough” and that he was taking responsibility, but denied that he killed the victim, stating that it was not supposed to “go down the way it did.”
Following the penalty-phase proceedings, the trial court found the following aggravating circumstances: (1) Sanchez-Torres had been convicted of a prior violent felony; and (2) the murder was committed during the course of a robbery (merged with pecuniary gain). The trial court gave both aggravators great weight. The trial court found that the cold, calculated, and premeditated aggravator was not established beyond a reasonable doubt because “it is not unreasonable to infer that evidence presented during the sentencing proceedings could suggest that the fatal gunshot was the result of an accidental discharge of the gun.”
The trial court then addressed the proposed statutory mitigating circumstance of age. However, the trial court stated that it “decline[d] to assign significant weight to this mitigator.” The trial court found the statutory mitigator that Sanchez-Torres was an accomplice and that his participation was relatively minor did not apply, because “whether or not [Sanchez-Torres] was the person who fired the fatal shot that killed Eric Joel Colon, his participation was not minor” and, further, the court “was presented with competent evidence that [Sanchez-Torres] may have in fact been the individual who pulled the trigger.”
The trial court found twenty-two non-statutory mitigators: (1) Sanchez-Torres can have a positive impact on his family and friends, who continue to love and support him (slight weight); (2) Sanchez-Torres was a peaceful child and enjoyed spending time with his family (slight weight); (3) Sanchez-Torres was a good athlete and a baseball player (slight weight); (4) Sanchez-Torres’s father had a gambling problem and was addicted to drugs and alcohol (slight weight); (5) Sanchez-Torres’s parents were divorced when he was twelve years old[3] (slight weight); (6) Sanchez-Torres moved away from his mother and sister when he was fifteen to live with his father in Connecticut (slight weight); (7) Sanchez-Torres lived in a bad neighborhood while in Connecticut and received little supervision from his father (slight weight); (8) Sanchez-Torres’s father died from complications of alcohol and drug abuse and Sanchez-Torres was very emotional at his father’s funeral (slight weight); (9) Sanchez-Torres was a good brother to his siblings (little weight); (10) Sanchez-Torres was outgoing and was considered to be the “clown” of his family (some weight); (11) Sanchez-Torres was kind and respectful to his family, friends, and coworkers (some weight); (12) Sanchez-Torres had difficulty in school (slight weight); (13) Sanchez-Torres was a reli *668 able employee, with a consistent work record from a young age (the trial court found this mitigator but failed to specify the weight given); (14) Sanchez-Torres did charitable deeds, volunteered for several organizations, and was helpful to others (slight weight); (15) Sanchez-Torres loves his child and desires to be a supportive father during imprisonment (slight weight); (16) Sanchez-Torres loves animals (slight weight); (17) Sanchez-Torres took responsibility for his crimes by confessing to police (little weight); (18) Sanchez-Torres has expressed remorse for his conduct (slight weight); (19) Sanchez-Torres has been a good inmate while incarcerated and is capable of adapting well to long-term incarceration (slight weight); (20) Sanchez-Torres exhibited appropriate conduct throughout the proceedings and was polite, cooperative, and respectful to his attorneys and legal staff during his criminal cases (slight weight); (21) Sanchez-Torres believes in God and joined a church on his own (slight weight); and (22) society can be protected by life sentences without parole (some weight).
After considering and weighing the aggravating and mitigating circumstances, the trial court determined that the aggravating circumstancés outweighed the mitigating circumstances and sentenced Sanchez^-Torres to death.
ANALYSIS
On appeal, Sanchez-Torres raises three claims: (1) his plea of guilty to first-degree murder and armed robbery was not knowingly, intelligently, and voluntarily entered; (2) the trial court erred in not considering polygraph results as mitigating evidence; and (3) the trial court should have given great weight to the mitigator of Sanchez-Torres’s age. In addition to the issues raised by Sanchez-Torres, this Court must consider whether the death sentence is proportional. We address each issue in turn.
I. The Guilty Plea
In his first claim, Sanchez-Torres contends that his guilty plea was not knowing, intelligent, and voluntary, because of an incomplete understanding of the charges and consequences of his plea. When a defendant has pleaded guilty to a charge of first-degree murder, this Court’s mandatory review of the sufficiency of the evidence “shifts to the knowing, intelligent, and voluntary nature of that plea.” Russ v. State, 73 So.3d 178, 199 (Fla.2011) (quoting Barnes v. State, 29 So.3d 1010, 1020 (Fla.2010)).
“Due process requires a court accepting a guilty plea to carefully inquire into the defendant’s understanding of the plea, so that the record contains an affirmative showing that the plea was intelligent and voluntary.” Koenig v. State, 597 So.2d 256, 258 (Fla.1992). “Because a guilty, or no contest, plea has serious consequences for the accused, the taking of a plea ‘demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence.’ ” Id. (quoting Boykin v. Alabama, 395 U.S. 238, 243-44, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)). “A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, “with sufficient awareness of the relevant circumstances and likely consequences.’ ” Bradshaw v. Stumpf, 545 U.S. 175, 183, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005) (quoting Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).
Florida Rule of Criminal Procedure 3.172 governs the taking of pleas in criminal cases and “provides basic procedures designed to ensure that a defendant’s *669 rights are fully protected when he enters a plea to a criminal charge.” Koenig, 597 So.2d at 258. Rule 3.172(c) requires the trial court to determine the voluntariness of the plea based on a court inquiry to determine, in relevant part, that the defendant understands the following:
(1) the nature of the charge and the mandatory minimum and maximum penalties provided by law; (2) that he or she has a right to an attorney and that one will be appointed if necessary; (3) that the defendant has the right to plead not guilty and to be tried by a jury with assistance of counsel, to compel attendance of witnesses, to confront and cross-examine witnesses, and the right not to be compelled to incriminate himself or herself; (4) that a plea will give up the right to appeal all matters relating to the judgment unless expressly reserved; (5) that there will be no trial; (6) that the trial judge may examine the defendant under oath about the offense and that the answers may be later used against the defendant; (7) the terms of any plea agreement; and (8) that a plea may subject the defendant to deportation if he or she is not a United States citizen.
Gill v. State, 14 So.3d 946, 960-61 (Fla.2009).
 This Court “scrutinize^ the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.” Altersberger v. State, 103 So.3d 122, 128 (Fla.2012) (quoting Winkles v. State, 894 So.2d 842, 847 (Fla.2005)). “In reviewing a claim of an involuntary and unintelligent plea, courts look to the totality of the circumstances.” State v. Perry, 786 So.2d 554, 557 (Fla.2001), receded from on other grounds by Major v. State, 814 So.2d 424 (Fla.2002).
We note at the outset that after the plea was entered, the trial court actually offered to set aside the guilty plea at the beginning of the penalty-phase proceedings a few days after the entry of the plea, stating that there were jurors standing by for the guilt phase of the trial. Sanchez-Torres stated that he did not wish to do so, and there is no indication in this record of a motion to withdraw the plea or a hearing on a request to withdraw the plea at any time during the trial court proceedings. Therefore, the voluntariness of the plea is determined solely based on the record before us.
The primary basis of Sanchez-Torres’s claim that his guilty plea was not knowing, intelligent, and voluntary is that he was unaware of the nature and elements of the charges to which he was pleading guilty. Specifically, he asserts that he believed that he was guilty of premeditated first-degree murder for failing to report the shooting to the police. He also asserts that the record is not clear whether he was entering a plea to premeditated murder, felony-murder, or both.
The United States Supreme Court has explained that
[a] plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving, or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense.
Henderson v. Morgan, 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976) (emphasis added) (citation omitted). Henderson was a case that was decided after state postconvietion proceedings where an evidentiary hearing was held as *670 to what the lawyer conveyed to the defendant and during which the evidence established that neither the lawyer nor the trial court explained the element of intent to cause death with respect to the defendant’s plea to second-degree murder. Id. at 689, 96 S.Ct. 2258.
Sanchez-Torres contends that he is entitled to relief on direct appeal because the record does not contain an affirmative representation that the nature of the charges and elements were ever explained to him. Further, he argues that the trial court failed to require that the defense attorneys affirm that they explained the elements of the charges prior to the plea. However, neither ground forms the basis for per se reversal under Henderson. See id. at 647, 96 S.Ct. 2253 (“Normally the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been explained to the accused. Moreover, even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit.” (emphasis added)). The United States Supreme Court has also explained that it has
never held that the judge must himself explain the elements of each charge to the defendant on the record. Rather, the constitutional prerequisites of a valid plea may be satisfied where the record accurately reflects that the nature of the charge and the elements of the crime were explained to the defendant by his own, competent counsel. Where a defendant is represented by competent counsel, the court usually may rely on that counsel’s assurance that the defendant has been properly informed of the nature and elements of the charge to which he is pleading guilty.
Bradshaw, 545 U.S. at 183, 125 S.Ct. 2398 (citation omitted). However, the Bradshaw Court did not set forth an affirmative requirement that the trial court must always inquire of defense counsel as to whether the nature and elements of the crime were explained in order for the plea to be valid.
In this case, the indictment charged first-degree murder both on the basis of premeditated first-degree murder and felony murder with armed robbery as the underlying felony, and a jury would have been permitted to return a general verdict for first-degree murder without specifying the theory under which it found Sanchez-Torres guilty. See Miller v. State, 42 So.3d 204, 227 (Fla.2010). At a minimum, it is clear from the plea colloquy that Sanchez-Torres understood that by planning and participating in the armed robbery, he was guilty of first-degree felony murder. The failure of the trial judge to set forth the elements of both first-degree premeditated murder and felony murder based on armed robbery, or the failure of defense counsel to expressly represent on the record that the elements of both had been explained to Sanchez-Torres, without more, does not entitle Sanchez-Torres to relief on direct appeal with respect to the alleged involuntariness of the plea. See Bradshaw, 545 U.S. at 183-86, 125 S.Ct. 2398 (“Stumpf argues, in essence, that his choice to plead guilty to the aggravated murder charge was so inconsistent with his denial of having shot the victim that he could only have pleaded guilty out of ignorance of the charge’s specific intent requirement. But Stumpf s asserted inconsistency is illusory.... Ohio law considers aiders and abettors equally in violation of the aggravated murder statute.... While Stumpf s mitigation case was premised on the argument that Stumpf had not shot *671 [the victim], that was fully consistent with his plea of guilty to aggravated murder.”).
Further, at the beginning of the plea colloquy, the defense lawyer began by explaining that Sanchez-Torres intended to plead guilty because it was in his best interests and in order to take responsibility for his actions:
DEFENSE ATTORNEY: Your Honor, [Sanchez-Torres] is before the Court. I have met with [Sanchez-Torres] numerous times and discussed all of his options with him numerous times, and this morning we are going to enter a plea of guilty with the understanding that there’s no agreement with the State to waive death. We have reached that decision. We’ve discussed various options. We’ve discussed the fact that he was not the shooter, and — and we believe that we could present evidence of that.
Despite the fact that he was not the shooter, ... [Sanchez-Torres] understands that he is just as responsible for Mr. Colon’s death, and he believes that this is in his best interest and he is ready and willing to take responsibility for his — for his actions. And, you know, he — he tried to resolve both of his cases by entering pleas with the State’s agreement to waive death, and that was refused. Anyway, this is his decision and mine, and he’s had time to discuss it with me, with his mother, and this is what he wants to do.
(Emphasis added.)
After a thorough review of the plea colloquy and the record in this case, we conclude that the record currently before this Court does not demonstrate that Sanchez-Torres had “such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt.” Henderson, 426 U.S. at 645 n. 13, 96 S.Ct. 2253. Sanehez-Torres’s assertion that his trial counsel “failed to inform and discuss with [him] the true nature of the charges and elements against him” is a claim of ineffective assistance of counsel more appropriately brought in postconviction proceedings. As explained by the Eleventh Circuit Court of Appeals in a habeas corpus case relied upon by Sanchez-Torres, “[d]ue process does not require that the defendant, in pleading guilty, be informed of each element of the crime in question at the plea hearing. The defendant may receive detailed information about the elements of the offense beforehand. Most commonly, his attorney provides such information.” Gaddy v. Linahan, 780 F.2d 935, 944 (11th Cir.1986) (citation omitted).
Sanchez-Torres also contends that he entered the plea with the misunderstanding that the trial court could impose the death penalty only if it found that he had shot the victim. We conclude that the record currently before this Court fails to demonstrate that Sanchez-Torres did not understand that death was a possible penalty, regardless of whether the trial court found that he was the shooter during penalty-phase proceedings.
During the plea colloquy, there is no question that the issue of whether Sanchez-Torres was the shooter, and his denial that he was the shooter, came up on several occasions. Sanchez-Torres points to a statement made by the trial court that he contends implied that the trial court could impose the death penalty only if it found that he was the shooter:
THE COURT: And you fully understand that — that based upon the evidence that will be presented to me, I can still determine that you were the shooter, and I can still impose the death penalty?
SANCHEZ-TORRES: Yes, sir.
*672 Standing alone, this statement could have created confusion, but we must consider the totality of the plea colloquy. The plea colloquy as a whole does not support the claim that Sanchez-Torres failed to understand that he could be sentenced to death even though he was not found to be the shooter.
First, his lawyer began the plea colloquy by stating that the defense had sought an agreement with the State to waive seeking the death penalty but that the State would not agree. Second, it was explained to Sanchez-Torres that the charge to which he was pleading guilty was punishable either by life in prison or by death. Third, Sanchez-Torres confirmed that no specific promises had been made to him as to the penalty. Fourth, the trial court explained in no uncertain terms that Sanchez-Torres’s prior violent felony (the July 2008 Duval County murder) was an “aggravation that the state attorney can use, and it’s probably the strongest aggravation they could bring out against somebody for the imposition of the death penalty” and that the State would be “using that against [him] in this case.”
If in postconviction, it turns out that Sanchez-Torres’s lawyer misunderstood that Sanchez-Torres could be subject to the death penalty only if he was found to be the shooter or gave Sanchez-Torres any misadvice or incomplete information, the implications of that misadvice can be addressed at that time. However, on this record, there is absolutely no indication that there was any misadvice of counsel with respect to the possible penalties or that the potential of the death penalty was not thoroughly explained. Further, to the extent that Sanchez-Torres relies on his defense counsel’s alleged misunderstanding of the law regarding Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987),[4] as demonstrative of Sanchez-Torres’s lack of understanding that he could be sentenced to death even if the trial court did not find he was the shooter, granting relief on this basis on this record would also require speculation.
Finally, Sanchez-Torres contends that he was unaware that he would be forced to give a sworn statement and testify for the State in his codefendant’s trial. However, during the plea colloquy, the trial court specifically advised Sanchez-Torres that he was waiving his right to remain silent. This stands in stark contrast to Koenig, 597 So.2d at 258, in which this Court held that a plea was not knowing, intelligent, and voluntary where “the brief colloquy between the trial court and Koenig failed even to mention any of the[ ] rights [enumerated in Florida Rule of Criminal Procedure 3.172(c), including the right to avoid compelled self-incrimination]. Although the judge did ask Koenig if he understood that he was waiving ‘certain rights,’ he never explained what those rights were.” Id.
*673 Although Sanehez-Torres asserts that “defense counsel did not explain to [him] that he would lose his Fifth Amendment right to remain silent after his guilty plea, and that he could be subject to deposition and forced to testify against co-defendant’s case,” this is in actuality an ineffective assistance of counsel claim more appropriately brought during postconviction proceedings where evidentiary development can take place, if warranted.
We conclude that Sanchez-Torres’s plea was knowing, intelligent, and voluntary. Accordingly, we deny this claim.
II. Polygraph Results
In this claim, Sanehez-Torres contends that the trial court reversibly erred in failing to consider polygraph results as mitigating evidence in the penalty phase. Specifically, Sanehez-Torres argues that the polygraph results provided strong evidence that he was not the triggerman and, therefore, were relevant to the issue of relative culpability. The trial court did not consider the polygraph results as a mitigating circumstance, relying on our precedent in Perry v. State, 395 So.2d 170 (Fla.1980), and Christopher v. State, 407 So.2d 198 (Fla.1981).
We decline in this case to revisit our precedent since any possible error in the trial court not considering the polygraph results was harmless beyond a reasonable doubt. The trial court expressly did not base its rulings as to mitigation or its sentence of death on a finding that Sanchez-Torres was the triggerman. The trial court found in its sentencing order that Sanehez-Torres was “instrumental in both the planning and robbery of’ the victim and that the “evidence, in the Court’s view, justifies a conclusion that [Sanchez-Torres] was not a relatively minor participant in this crime.” The trial court expressly stated that it was “not making a finding that [Sanehez-Torres], in fact, was the person who shot [the victim]. Nor has this Court relied upon the inference that [Sanehez-Torres] may have been the trig-german as an aggravating factor justifying the death penalty.” (Emphasis added.)
We conclude that there is no reasonable possibility that any error in excluding the polygraph results that Sanehez-Torres was not the shooter affected the sentence. See Barnes v. State, 29 So.3d 1010, 1027 (Fla.2010) (stating that “[a]n error is harmless beyond a reasonable doubt when, after considering all the permissible evidence, a court concludes that there is no reasonable possibility that the error contributed to the jury’s recommendation of death” (quoting Rodgers v. State, 948 So.2d 655, 665 (Fla.2006))).
Accordingly, we deny this claim.
III. Age Mitigator
In this claim, Sanehez-Torres argues that the trial court erred in failing to give great weight to the statutory miti-gator of age because the trial court ignored evidence that Sanchez-Torres’s crime was related to his age, mental and emotional immaturity, and the resultant inability to cope with the stresses of life. Sanehez-Torres was nineteen years old at the time of the murder.
“[W]here the defendant is not a minor, ... ‘no per se rule exists which pinpoints a particular age as an automatic factor in mitigation.’ The existence and weight to be given to this mitigator depends on the evidence presented at trial and the sentencing hearing.” Nelson v. State, 850 So.2d 514, 528-29 (Fla.2003) (citation omitted) (quoting Shellito v. State, 701 So.2d 837, 843 (Fla.1997)). “[T]he fact that a defendant is youthful, without more, is not significant. Therefore, if a defendant’s age is to be accorded any significant weight as a mitigating factor, it must be linked with some other characteristic of *674 the defendant or the crime such as immaturity.” Mahn v. State, 714 So.2d 391, 400 (Fla.1998) (citations and internal quotation marks omitted); see also Lebron v. State, 982 So.2d 649, 660 (Fla.2008) (“In Florida, numerical age alone may not be mitigating if not linked to some other material characteristic (e.g., immaturity).”)
The trial court’s sentencing order stated that it “decline[d] to assign significant weight to this mitigator,” but did not state whether it was finding the age statutory mitigator, and did not indicate what weight it gave to the mitigator if found. Sanchez-Torres argues that the trial court erred in failing to give great weight to this mitigator. “This Court reviews a trial court’s assignment of weight to mitigation under an abuse of discretion standard.” Bevel v. State, 983 So.2d 505, 521 (Fla.2008).
We conclude that there was no abuse of discretion in failing to afford the age miti-gator significant weight. After a complete review of the extensive number of mitigation witnesses and evidence presented, we conclude that Sanchez-Torres ignores the overwhelming amount of evidence supporting the trial court’s finding that
the defense presented numerous witnesses who testified as to instances of [Sanchez-Torres’s] conduct that, unlike the general conduct of many teenagers, demonstrate maturity and responsibility. [Sanchez-Torres] was seemingly self-sufficient, had consistently held a full-time job, paid for his own apartment and car, and provided financial assistance to his mother and little sister.
The evidence and testimony relied upon by Sanchez-Torres did not require the trial court to assign great weight to the age mitigator. As the trial court found, “[n]o compelling evidence was presented that [Sanchez-Torres’s] age is linked with some other characteristic of [Sanchez-Torres] or the crime, such as significant emotional immaturity or mental problems.”
Sanchez-Torres relies on Mahn, 714 So.2d at 400, to support his contention that the trial court abused its discretion in declining to assign significant weight to the mitigator in this case. In Mahn, this Court observed as follows:
[T]he record shows that Mahn was far from a normal nineteen-year old boy at the time of the killings. Rather, Mahn had an extensive, ongoing, and unrebut-ted history of drug and alcohol abuse, coupled with lifelong mental and emotional instability. Mahn’s unrefuted, long-term substance abuse, chronic mental and emotional instability, and extreme passivity in the face of unremitting physical and mental abuse provided the essential link between his youthful age and immaturity which should have been considered a mitigating factor in this case.
714 So.2d at 400 (emphasis added) (footnote omitted). The record in this case contains no comparable — or even similar— evidence to that presented in Mahn. In contrast, the totality of the record in this case painted a picture of a responsible and reliable young man who had faced difficulties in his life, but had nevertheless consistently held and excelled at the same job for years, provided financial assistance to others, and shouldered numerous responsibilities.
Accordingly, we deny the claim that the trial court erred in not giving significant weight to this mitigator.
IV. Proportionality
Although Sanchez-Torres does not raise proportionality as an issue, “this Court conducts a review of each death sentence for proportionality, regardless of whether the issue is raised on appeal.” Carter v. State, 980 So.2d 473, 485 (Fla. *675 2008).[5] “The death penalty is ‘reserved only for those cases where the most aggravating and least mitigating circumstances exist.’ ” Silvia v. State, 60 So.3d 959, 973 (Fla.2011) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). “Therefore, in deciding whether death is a proportionate penalty, the Court makes a ‘comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Id. (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). Accordingly, the Court “eonsider[s] the totality of the circumstances of the case and compare[s] the case to other capital cases.” Offord v. State, 959 So.2d 187, 191 (Fla.2007). “This analysis ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Silvia, 60 So.3d at 973 (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, this entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Id. (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). “In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors.” Id.
In this case, after Sanchez-Torres waived a jury for the penalty phase, the trial court sentenced him to death. The trial court found the following aggravating circumstances: (1) prior violent felony (great weight); and (2) commission during the course of a robbery (merged with pecuniary gain) (great weight). The prior violent felony was based on a murder to which Sanchez-Torres confessed, which took place less than two months before the murder in this case.
As discussed above, it is not clear whether the trial court found any statutory mitigation. The trial court found numerous nonstatutory mitigators, such as that Sanchez-Torres was a peaceful child who enjoyed spending time with his family; that he was a reliable employee; that he was a good brother; that he was outgoing, kind, and respectful; that his parents had divorced when he was a teenager; that his father had died from complications of alcohol and drug use and he was emotional at the funeral; that he took responsibility for his crimes by confessing and has expressed remorse; and that he believed in God and joined a church on his own. No mental health mitigation was presented or found.
This case is similar to Hayward v. State, 24 So.3d 17, 46 (Fla.2009), in which this Court upheld the death penalty as proportional in a case involving the same two aggravators and similar nonstatutory mitigation. In Hayward, the victim was a newspaper delivery man who was robbed and shot while filling up a newsstand at a convenience store in the early morning hours. Id. at 23. Two aggravators were found by the trial court: “(1) prior violent felony (based on three prior violent felonies including second-degree murder) which was given great weight; and (2) that *676 the murder was committed while Hayward was engaged in a robbery, which was merged with the pecuniary gain aggravator and given great weight.” Id. at 46. These two aggravators were weighed against eight nonstatutory mitigating factors that were given very little to some weight, including that the defendant grew up without a father, was loved by his family, had academic problems, obtained a GED in prison, and had financial stress at the time of the crime. Id.
Accordingly, we conclude that Sanchez-Torres’s death sentence is proportional.
CONCLUSION
Based on the foregoing, we affirm Sanchez-Torres’s convictions and sentence of death.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Codefendant Marked Thomas was only seventeen years old at the time of the murder. He was convicted of first-degree murder and armed robbery by a jury, which made a specific finding that Thomas "did not actually possess or discharge a firearm during the commission of the offense.”

. Sanchez-Torres has since obtained his GED while incarcerated.

. Torres testified that she and Sanchez-Torres's father divorced when Sanchez-Torres was fifteen years old, not twelve years old.

. The holdings of the U.S. Supreme Court in Enmund and Tison have been summarized by this Court as follows:
The United States Supreme Court and this Court have consistently held that a sentence of death must be proportional to the defendant’s culpability. Thus, in Enmund the Court indicated that in the felony murder context a sentence of death was not permissible if the defendant only aids and abets a felony during the course of which a murder is committed by another and defendant himself did not kill, attempt to kill, or intend that a killing take place or that lethal force be used. Later, in Tison the Court said a sentence of death in the felony murder context can be proportional if the defendant is a major participant in the felony and the defendant's state of mind amounts to a reckless indifference to human life.
Stephens v. State, 787 So.2d 747, 759 (Fla.2001).

. This Court conducts a relative culpability proportionality analysis in cases involving more than one defendant. See Shere v. Moore, 830 So.2d 56, 60 (Fla.2002) ("[I]n cases where more than one defendant was involved in the commission of the crime, this Court performs an additional analysis of relative culpability. Underlying our relative culpability analysis is the principle that equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment.''). However, that analysis is inapplicable here because codefendant Thomas was seventeen at the time of the crime and therefore ineligible for the death penalty.