# Supreme Court of Florida

_____

No. SC15-954
_____

**ZACHARY TAYLOR WOOD,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 31, 2017]

PER CURIAM.

Zachary Taylor Wood, who was twenty-three years old at the time of the crimes, appeals his conviction and death sentence for the April 2014 first-degree murder of James William Shores. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Wood's conviction. However, we conclude that the trial court erred as a matter of law in finding two of the three aggravating factors, which served as a predicate for imposing Wood's death sentence, and erred as a matter of law in rejecting some of the uncontroverted mitigation offered. After conducting our independent review of the remaining single aggravating factor, which was that the capital felony was committed while

Wood was engaged or was an accomplice in the commission of a burglary and robbery, we conclude that this murder is not among the most aggravated and least mitigated of first-degree murders and, therefore, conclude that Wood's death sentence is disproportionate. Accordingly, we uphold Wood's convictions but vacate the sentence of death and remand to the trial court for imposition of a mandatory life sentence without parole.

## FACTS AND PROCEDURAL HISTORY

### The Guilt Phase

On the evening of April 19, 2014, an Alabama State Trooper began a high-speed pursuit of a gold-colored Toyota Camry on Alabama State Highway 167, just south of the city of Enterprise, Alabama. The pursuit ended when the Camry and the patrol car crashed into a ditch off a nearby county road after the patrol car was shot at from the Camry during the chase. Once both cars were stopped, the Camry returned more gunshots to the nearby patrol car, and the Alabama State Trooper reciprocated. During the shootout, the driver of the Camry, Dillon Scott Rafsky, fled the Camry but was quickly apprehended by Alabama law enforcement approximately two miles from the scene. Wood, a passenger in the Camry, was taken into custody at the scene of the crash.

Upon processing the crime scene in Alabama the same night, law enforcement discovered inside the Camry a wallet and passport belonging to a

sixty-six-year-old James William Shores, the registered owner of the car. The identification indicated that Shores resided in Washington County, Florida, a small, rural county in Northwest Florida. Concerned, Alabama law enforcement contacted the Washington County Sheriff's Office and asked them to conduct a welfare-check on Shores. Shores' brother, Joe Boy Shores, was subsequently contacted by an employee of the Washington County Sheriff's Office. He left his house and traveled to Shores' nearby trailer, where he was met at 1:30 a.m. on April 20, 2014, by a Washington County Sheriff's deputy responding to the welfare-check call. After both determined that Shores was not present, Joe Boy suggested to the deputy that they check a "family farmhouse" on Shores' property that was accessible by a small trail behind the trailer because he had seen a dark-colored Jeep Grand Cherokee parked near that house when he drove to Shores' trailer, even though Shores did not own such a Jeep. Joe Boy and the deputy walked to the house and discovered Shores' body lying face down at the back of the house. Shores was wearing a red flannel shirt and blue jeans. He was bound at the legs with a cloth. His hands were bound behind his back with a heavy metal chain. Shores had sustained massive trauma to his head. The deputy called for backup to secure the crime scene.

That same day, Washington County Sheriff's Office investigators traveled to the Geneva County, Alabama jail to interview Wood. Sitting in the jail's library

- 3 -

after having recently been released from a local hospital where he had been treated for injuries sustained the previous day, Wood gave a statement in which he recounted an unfolding series of events occurring just north and south of the Florida-Alabama state line that led to Wood and Rafsky becoming stranded on Shores' Florida property the day before. Wood's statement was videotaped and later played to the jury during the guilt phase of the trial.

In his statement, Wood told investigators that on Thursday, April 17, 2014, he was residing at the Enterprise Inn & Suites in Enterprise, Alabama. That day, he went with Rafsky to borrow a dark-colored Jeep Grand Cherokee belonging to Kelly Eggleston, who was a mutual friend and former neighbor of Wood. Wood and Rafsky went "dirt road riding" in the Jeep, but got stuck on a dirt road in Coffee Springs, Alabama on Friday, April 18, 2014, and eventually spent the night on the road. On the morning of Saturday, April 19, 2014, a farmer who lived nearby pulled the stranded Jeep out of the mud. Rafsky and Wood continued "dirt road riding" that morning before heading to Rafksy's parents house a little outside of Elba, Alabama. Wood and Rafsky were at Rafsky's parents' house at 9:30 A.M. that Saturday morning, before they departed for Florida. Once in Florida, they stopped at a Dollar General Store near Bonifay, Florida, as well a foodmart inside a Chevron gas station. Passing Bonifay, they went to a small general store named "Fred's," where Wood stole some pants, a shirt, and two Gatorades. Rafsky

continued driving on Highway 167[1] for about three or four miles before turning left on a dirt road.

Once on the dirt road, they continued "dirt road riding" and ended up splashing mud onto a mail carrier's car parked on the road. They pulled up next to the mail carrier, and Wood got out to apologize and also to ask the mail carrier if they could "bum" two cigarettes off of her. She obliged, and they continued to go "dirt road driving" until they passed an "abandoned house," where Rafsky proceeded to reverse the Jeep into its driveway. Upon reversing, Rafsky went too far off the driveway and got stuck in the yard.[2] Once the Jeep was stuck, Rafksy told Wood that they were "meant to be" at the house. Wood believed they were driving to meet a mutual friend, Heather Williamson, who also lived on a dirt road outside Bonifay.

Rafsky and Wood entered the house and then "plunder[ed]" it before eating cupcakes and drinking Gatorade they had gotten from Fred's general store. According to Wood, neither he nor Rafsky were looking for anything in particular, but Rafsky took some paperwork from the house and used the bathroom. They

---

1. Highway 167 in Alabama is referred to State Road 79 in Florida.

2. Joe Boy Shores testified at trial that the Jeep likely got stuck in muddy soil where a large pecan tree had once stood, but that had been recently removed.

then left the house and began attempting to free the Jeep from the mud, without success.

About a half-hour after they got stuck, the victim, James Shores, pulled into the driveway in a gold-colored Toyota Camry and told them they needed to leave his property and that he would call the sheriff's office to remove the Jeep from the yard. Wood told Shores that he would fill in the holes caused by the Jeep and cover the holes with grass. Shores agreed, but advised that he would write down the Jeep's license plate number "just in case." After writing the license plate number down, Shores continued around the house.

According to Wood, Rafsky followed Shores around the house, and Wood soon after heard a "bumping" noise. Wood followed Rafsky and saw that he had beaten Shores with a garden hoe. Rafsky told Wood that Shores had tried to attack him. At the time Rafsky followed Shores around the house, Wood was "messing with" a mailbox in front of the house "out of frustration" because, as Wood explained, Rafsky "gets so angry." Therefore, Wood claimed that he was unsure of whether Rafsky took the garden hoe with him to assault Shores, or whether the garden hoe was already nearby.

Rafsky asked Wood for a chain, and asked him to find something else to bind Shores. Wood found a shirt in the house and bound Shores' legs with the shirt. Shores was still alive, and Wood may have punched him a few times to

show Rafsky that he was not afraid and would not rat out Rafsky. However, Shores was not kicking or otherwise resisting. Wood claimed that Rafsky poured STP gas treatment on Shores and wanted Wood to "catch the old man on fire," but Wood struck every match he had so it would appear to Rafsky that the matches would not light. At Rafsky's instruction, he took the license plate off the Jeep and placed it in Shores' Camry. While taking the license plate off the Jeep in the front of the house, Wood heard one gunshot fired.

About thirty minutes after the altercation with Shores, Wood and Rafsky left the property in Shores' gold-colored Camry. Wood had moved a double-barrel shotgun from the Camry's trunk to the front seat when he placed the Jeep's license plate in the Camry's trunk. Wood threw the gym shorts he was wearing out of the window of the Camry somewhere outside Bonifay. They traveled to Hartford, Alabama, then to Enterprise, then to Daleville, Alabama, and then back to Hartford and Enterprise down Highway 167 when an Alabama State Trooper began pursuit. During pursuit, Rafsky asked Wood to hand him the shotgun Wood had previously placed in the front seat. Rafsky then asked Wood to shoot the gun at the officer, but Wood refused. Rafsky then slid the gun across his lap, aimed it out the window, and shot.

Wood was subsequently indicted and tried for the murder of Shores.[3] At trial, Captain Mark Collins of the Washington County Sheriff's Office testified that Wood's statement to investigators was extremely helpful, and that investigators were able to verify many details of the unfolding events leading up to and after Shores' murder.

Wood also testified at trial about the events leading up to the murder that largely mirrored his initial statement given to police investigators, except that he admitted that he ingested about one-half gram of methamphetamine when in the house; claimed that Rafsky shot him in the thigh the day before when Wood asked Rafsky to drop him off; stated that Rafsky had sold the gun he used to shoot Wood with before the pair entered Florida; and clarified that Wood threw his shorts out of the Camry's window when leaving Florida. Additionally, Wood testified that he and Rafsky had begun to drive away in the Camry after beating Shores, when Rafsky stopped the car and walked back to Shores and shot him. As Wood testified, Rafsky drove "maybe five—no more than ten feet . . . put[] the car in park, pops the tru[n]k and gets out, and . . . walks back to where Mr. Shores is. I did not see it, but I heard a gunshot fired." Rafsky then got back into the Camry

---

3. Rafsky was charged in the same indictment. State v. Rafsky, No. 672014CF00138A (Fla. Cir. Ct. 14th Cir. Apr. 19, 2014) (Indictment). As of this date, he has not yet stood trial.

and continued driving. Wood explained that he did not tell the investigators these additional facts in his initial statement because his interview took place shortly after he was released from the hospital and he was under the influence of heavy drugs.

Forensic crime scene investigators testified at Wood's trial that DNA testing excluded Shores and Wood as contributors of DNA found on the Jeep's steering wheel, driver's door, and gear shift. DNA testing could neither include nor exclude Rafsky from the steering wheel, but could include Rafsky for the driver's door. Wood could neither be included nor excluded for the driver's door. Rafsky could be included for the gear shift knob, and Wood could neither be included nor excluded from the gear shift knob. DNA testing of the Jeep's glovebox revealed a major contributor of Wood and a minor contributor of Shores, which the forensic investigator testified meant that either Shores came into contact with the glovebox door or there was a secondary transfer via Wood, which might occur if any of Shores' bodily fluids were on Wood. Additionally, DNA testing of the Charles Daly 20-gauge shotgun recovered from the Camry revealed a full profile for Rafsky, but neither included nor excluded Wood.

Crime scene investigators testified that the front door to the house had a muddy shoeprint in the middle of the door and the door's side latch was damaged, suggesting that the door had been kicked in. Two cigarette butts were found in the

house, one in the bathroom toilet and another in the fireplace, and both were collected to be tested for DNA evidence. Later DNA analysis confirmed that the cigarette butt in the toilet belonged to Rafsky and the one in the fireplace belonged to Wood. A discharged fire extinguisher was also located in the house, sitting on a counter in the kitchen. Barefoot prints and shoe impressions were found on the back porch.

Elizabeth Richey, an employee of the Florida Department of Law Enforcement (FDLE) firearms section also testified that the FDLE's testing of the shotgun shell, wadding, and pellet from Shores' body were consistent with Shores' Charles Daly 20-gauge shotgun. Carl Casteen, the chief of forensic services for the State Fire Marshall also testified and explained the examination process of Shores' red plaid shirt and undershirt, which revealed the presence of a "heavy petroleum distillate." Casteen explained that a "heavy petroleum distillate" could be, among other things, diesel fuel, kerosene, lamp oil, a solvent, or torch fuel in a citronella lamp, but could not be the contents of an STP bottle, since those contents are a "medium aromatic product."

The medical examiner for the Fourteenth Judicial Circuit, Dr. Michael Hunter, testified that Shores suffered multiple injuries to his head, as well as a laceration on his chin consistent with being struck by a garden hoe. Shores also suffered a fatal shotgun wound to the back of his head. There was no evidence of

stippling, but the shot distribution around the wound indicated that the shot was fired from not that far in distance. Dr. Hunter opined that an X-ray of Shores' head showed that the shot was distributed in a downward trajectory, which was consistent with being shot while the victim was on the ground, facedown. Dr. Hunter opined that it was impossible for him to conclude whether Shores was unconscious after being struck multiple times by the garden hoe, but before being shot. Dr. Hunter also opined that it was impossible to say whether the blunt force injuries to Shores' head and neck not caused by the shotgun would have been lethal over time without the shotgun injury. Regardless, he concluded they were contributory to Shores' death. No defensive type of injuries were present.

The jury found Wood guilty of first-degree murder under theories of premediated murder and felony murder, and guilty of burglary of a structure with a firearm, and robbery with a firearm.

**Penalty Phase**

During the penalty phase of Wood's trial, Wood called family members and friends.[4] Wood's older sister, Heather Griffin, testified about Wood's difficult childhood. Wood's older brother, Matthew Walker, and Wood's uncle, Jeffrey Wood, offered similar testimony about Wood's difficult childhood and the family's

---

4. The State presented no witnesses during the penalty phase.

history of drug abuse. Pat Lindsey, a retired judicial assistant and friend of Heather Griffin, testified that Wood worked in the Geneva County, Alabama courthouse organizing traffic tickets when Wood was in middle school and was always respectable and nice, but acknowledged on cross examination that she had not been in contact with Wood since he graduated high school. Laura Kinman testified that Wood, a friend of her daughter, stayed in her home for a few months at the end of 2012 and the beginning of 2013. Wood made the family dinner, bought groceries for them without being asked, and redid her flower garden, but Kinman acknowledged that she never interacted with Wood when he was high on methamphetamine. Laura Kinman's daughter, Kacia Kinman, testified that she had known Wood since they were in the seventh grade. She described Wood as a "kind-hearted gentleman," but also acknowledged that she had only seen Wood high on marijuana, and not methamphetamine. No mental health mitigation was presented.

The trial court instructed the jury on three aggravating factors: (1) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (2) the capital felony was committed while defendant was engaged, or was an accomplice in the commission of, or an attempt to commit burglary and/or robbery; and (3) the capital felony was committed for the purpose of avoiding arrest. The trial court also instructed the

jury to consider any other mitigating circumstances based on the defendant's character, background, or life, or any other circumstance of the offense. By a unanimous vote, the jury recommended that Wood be sentenced to death for the murder of Shores. A Spencer[5] hearing was held thereafter, where the State presented victim-impact testimony from the victim's daughter, brother, and niece.

In sentencing Wood, the trial court found each of the three aggravating factors on which it instructed the jury: (1) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (very great weight); (2) the capital felony was committed while defendant was engaged, or was an accomplice in the commission of, or an attempt to commit burglary and/or robbery (great weight); and (3) the capital felony was committed for the purpose of avoiding arrest (great weight). The trial court rejected all statutory mitigating circumstances except for the defendant's capability of employment and contribution to workforce (little weight), and the defendant's family background and abusive childhood (some weight). Additionally, the trial court found that Wood had proven the following nonstatutory mitigating circumstances: (1) the defendant had good jail conduct pending and during trial (very little weight); (2) the defendant's education (little weight); (3) the defendant

---

5. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

has support from loving siblings and friends (little weight); and (4) the defendant's cooperation with law enforcement (little weight). The court rejected as a nonstatutory mitigating circumstance that the defendant showed remorse. After finding the aggravating factors outweighed the mitigating circumstances, the trial court sentenced Wood to death for the murder of Shores.

## ANALYSIS

Wood raises five claims on appeal: (1) the evidence is insufficient to support Wood's conviction as a principal to premediated first-degree murder; (2) Wood's death sentence is disproportionate because the evidence did not prove beyond a reasonable doubt that Wood's mental state amounted to reckless indifference and more culpable defendants have received life sentences; (3) the trial court erred in applying the CCP and avoid arrest aggravating factors vicariously to Wood; (4); the trial court erred in rejecting as mitigating Wood's drug abuse history and his remorse; and (5) Wood's death sentence must be vacated under Hurst v. Florida, 136 S. Ct. 616 (2016). We conclude that the interaction of two of the claims—that the trial court erred in instructing the jury on and then finding the CCP and avoid arrest aggravating factors, and also erred in rejecting the mitigating circumstance of Wood's drug abuse history—renders Wood's death sentence disproportionate. When considering the remaining single aggravating factor of the contemporaneous felony of robbery and burglary, we find that this murder is not among the most

- 14 -

aggravated and least mitigated. Thus, we are compelled to vacate Wood's death sentence.[6]

We begin our analysis with our mandatory obligation to independently determine whether there is sufficient evidence to support Wood's conviction for first-degree murder.

### I. Sufficiency of the Evidence

"[T]his Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed." Yacob v. State, 136 So. 3d 539, 545 (Fla. 2014); Fla. R. App. P. 9.142(a)(5) ("[I]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."). In determining the sufficiency of the evidence, our inquiry is "whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

---

6. Additionally, because we vacate Wood's death sentence, we do not address his first claim because Wood concedes that even if the evidence is insufficient to support his conviction as a principal to premeditated murder, his first-degree murder conviction still stands because he was also convicted under a theory of felony murder.

Wood was charged with first-degree murder under both premeditated murder and felony-murder theories. See § 782.04, Fla. Stat. (2008). The jury found Wood guilty under both theories by a special verdict form. The felony-murder conviction was based on the jury finding Wood guilty of burglary of a structure with a firearm and robbery with a firearm.

The evidence presented established that Wood entered the "abandoned house" on Shores' property, and, in the words of Wood, "plunder[ed]" the house. Additionally, Shores' old checkbook was found on the dashboard of the Jeep; Wood was in possession of Shores' wallet and credit card and change from Shores' car; and Wood purchased and attempted to purchase various items hours after the murder with Shores' credit card. Based on a review of the evidence presented in this case, a "rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons, 934 So. 2d at 1111.

We conclude that the record contains competent, substantial evidence to support his conviction of first-degree murder, as well as his conviction of armed burglary of a structure and armed robbery. Accordingly, we affirm Wood's murder conviction. We now address Wood's claim that the trial court erred in applying the CCP and avoid arrest aggravating factors, and in rejecting certain mitigating circumstances.

## II. Sufficiency of Evidence of Aggravating Factors & Trial Court's Rejection of Mitigating Circumstances

"The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating [factor] is that of competent, substantial evidence." Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007). "When reviewing a trial court's finding of an aggravator, 'it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating [factor] beyond a reasonable doubt—that is the trial court's job.'" Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009) (quoting Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)). Rather, it is this Court's task on appeal "to review the record to determine whether the trial court applied the right rule of law for each aggravating [factor] and, if so, whether competent substantial evidence supports its finding." Id. (quoting Willacy, 696 So. 2d at 695).

## A. CCP Aggravating Factor

To establish the CCP aggravator, this Court has explained that

> [T]he evidence must show: (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold);" (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated);" (3) "the defendant exhibited heightened premeditation (premeditated);" (4) "the defendant had no pretense of moral or legal justification."

Gregory v. State, 118 So. 3d 770, 783 (Fla. 2013) (quoting Williams v. State, 37 So. 3d 187, 195 (Fla. 2010)). Each element of the CCP aggravator must be proven beyond a reasonable doubt. Banda v. State, 536 So. 2d 221, 224 (Fla. 1988). This

- 17 -

aggravating factor "is among the most serious aggravators set out in the statutory sentencing scheme." Deparvine v. State, 995 So. 2d 351, 381 (Fla. 2008). " 'CCP involves a much higher degree of premeditation' than is required to prove first-degree murder." Id. at 381-82 (quoting Foster v. State, 778 So. 2d 906, 921 (Fla. 2001)). This Court explained in Franklin v. State, that "[t]he CCP aggravator can 'be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.' " 965 So. 2d 79, 98 (Fla. 2007) (quoting Swafford .v State, 533 So. 2d 270, 277 (Fla. 1988)). "The manner in which a murder is carried out can also indicate a cold and calm plan," for example shooting the victim once in the head execution-style. Id. at 99 (citing Eutzy v. State, 458 So. 2d 755, 757 (Fla. 1984)).

Wood claims that there was not competent, substantial evidence to support the trial court's findings of the CCP aggravating factor. We agree. As we will explain, there was a lack of competent, substantial evidence to support the trial court's finding of the "heightened premeditation" element of CCP.

This Court has described the "heightened premeditation" element of the CCP aggravator as "deliberate ruthlessness." Fennie v. State, 648 So. 2d 95, 99 (Fla. 1994). The trial court concluded that Wood exhibited "heightened premeditation and deliberate ruthlessness" consistent with Buzia v. State, 926 So.

2d 1203 (Fla. 2006). However, this Court in <u>Buzia</u> concluded that the defendant's actions rose to the level of "deliberate ruthlessness because (1) he had the opportunity to leave the scene, and (2) he procured a weapon." <u>Id.</u> at 1214. As opposed to <u>Buzia</u>, in the instant case, although Wood could have fled the scene before Shores was shot—plausibly by escaping into the woods surrounding the crime scene—no evidence in the record indicates that Wood procured the murder weapon.

The State's argument in favor of application of the CCP aggravating factor is that, after Rafsky instructed Wood to light Shores on fire, Wood was aware Rafsky intended to kill Shores but "did nothing to prevent the killing." In support, the State relies on <u>Carr v. State</u>, 156 So. 3d 1052, 1069 (Fla. 2015), which affirmed the CCP aggravating factor where the defendant had an opportunity to renounce the planned murder, as well as <u>Cave v. State</u>, 727 So. 2d 227, 229 (Fla. 1998), where this Court also affirmed the CCP aggravating factor for a defendant who did not actually kill the victim but whose actions furthered the killing of the victim. However, both cases are distinguishable because the defendant either led the victim to the scene of the murder, <u>see id.</u>, or participated in a careful plan to commit the murder and had numerous opportunities during the planning of the murder to renounce the plan, <u>see Carr</u>, 156 So. 3d at 1069. Such careful preparation on Wood's part to kill Shores is absent in this case.

- 19 -

The murder in the instant case does not have the hallmarks of CCP. Wood did not procure the weapon used to kill the victim—the victim's Charles Daly 20-gauge shotgun—and, as the trial court acknowledged and the State conceded at trial, the evidence does not indicate that Wood inflicted the fatal gunshot wound. In fact, forensic testing of the shotgun neither includes nor excludes Wood from even handling the shotgun. Further, the trial court's factual finding that Wood intended to kill Shores by lighting him on fire is not supported by the record. Wood told investigators that Rafsky—not Wood—was who poured what Wood thought was STP gas treatment over Shores, and, after being instructed to light Shores on fire with a set of matches Rafsky handed him, Wood pretended that the matches would not light and threw them to the ground:

> Lieutenant. Kenny Brock: And there was some kind of chemical on—
>
> Wood: [Dillon] wanted me to catch the old man on fire.
>
> Lieutenant. Kenny Brock: So what did you pour on him?
>
> Wood: I think it was STP gas treatment he poured. And every match was lit, but what I did was I struck it and threw it, like it wouldn't light.
>
> Lieutenant. Kenny Brock: So you didn't actually throw it on him?
>
> Wood: No. Because I didn't want him to catch on fire.

(Emphasis added). Wood's testimony at trial was similar:

> Q.: At some point, somebody had an idea of squirting some kind of flammable liquid on him, how did that arise?

- 20 -

> Wood:  All is know is that—I know at one point whenever I was back there Dillon gave me some matches and he said, "Light him on fire." I would strike the matches and I would make it to where it wouldn't light every time because he was alive, I know he was alive.

The State presented no evidence to rebut Wood's claim, except for pictures of matches laying near Shores' body, and the trial court concluded that the matches "were too wet and would not light," without evidentiary support.  Accordingly, the trial court's finding that Wood had a conscious purpose or desire to kill Shores by lighting him on fire is not supported by competent, substantial evidence in the record.

We have stated that the CCP aggravating factor is "one of the most serious aggravators set out in the statutory scheme," Silvia v. State, 60 So. 3d 959, 974 (Fla. 2011), and requires an examination of the "conduct of the accused," Franklin, 965 So. 2d at 98.  After disregarding the trial court's erroneous finding that Wood attempted to light Shores on fire, the trial court's remaining findings in support of CCP's heightened premeditation element were based on the actions of Rafsky, not Wood.  Accordingly, we are compelled to strike this aggravating factor.

### B.  Avoid Arrest Aggravating Factor

Wood next asserts that the avoid arrest aggravating factor was improperly applied in this case.  As the trial court recognized, when the victim is not a law enforcement officer, "the evidence must prove [beyond a reasonable doubt] that

the sole or dominant motive for the killing was to eliminate a witness." Looney v. State, 803 So. 2d 656, 676 (Fla. 2001). This Court has explained that "the facts supporting commission of murder to avoid arrest must focus on the defendant's motivation for the crime." Id. (citing Rodriguez v. State, 753 So. 2d 29, 48 (Fla. 2000)). Further, "[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." Id. (citing Bates v. State, 465 So. 2d 490, 492-93 (Fla. 1985)). "[T]he mere fact that the victim . . . could identify [the] defendant, without more, is insufficient to prove this aggravator." Id.

In the present case, the trial court made the following findings pertaining to this aggravating factor:

> This Court is mindful that where the victim is not a law enforcement officer, the evidence must be "very strong" to prove that the sole or dominant motive for the killing was to eliminate a witness. Mere speculation cannot support this aggravator. Looney v. State, 803 So. 656 (Fla. 2001).
>
> The circumstantial evidence in this case demonstrates neither Defendant Wood nor Rafsky wore masks or gloves. Wood punched the victim. Shores was brutally attacked by a garden hoe and was bound by Defendant Wood and Rafsky using a chain and a shirt. Defendants were not prevented from leaving the property as Shores was subdued. Once in a position to offer no resistance or threat, an ignitable liquid was poured on Shores with Wood standing over his body striking matches to set him afire. As the attempt to burn Shores failed, Defendants used the victim's shotgun to inflict a lethal gunshot to his skull.
>
> Defendant Wood admits to removing the license tag from the Jeep and placing it into the trunk of victim's car. Defendant went into the glove compartment after physically touching Shores, probably

- 22 -

looking for Wood's misplaced wallet so as to avoid leaving his personal identification. Defendant's wallet was later found by law enforcement in the luggage area after the Jeep was towed to the Washington County Sheriff's Office. Wood later removed the gym shorts he wore at the scene and tossed them out on the highway. Wood's clothing was never recovered.

The Court relies upon the similar facts in Willacy v. State, 696 So. 2d 693 (Fla. 1997), as it finds the existence of this aggravator. As such, this Court finds the circumstantial evidence of defendants' actions leads to an inference that the primary purpose of the killing of James William Shores was to avoid detection and arrest. The Court finds beyond all reasonable doubt that the supporting evidence establishes this aggravating circumstance and gives it great weight.

We agree with the trial court that Shores' murder shares some factual similarities with the murder that was the subject of Willacy, where the victim, after walking in on her neighbor, Willacy, burglarizing her home, was bludgeoned by Willacy and bound by her hands and feet before Willacy lit her house on fire, leaving the victim to die. 696 So. 2d at 696. As this Court explained in affirming the avoid arrest aggravating factor in Willacy, the victim "was incapable of thwarting [Willacy's] purpose or of escaping and could not summon help. There was little reason to kill her except to eliminate her as a witness since she was his next door neighbor and could identify him easily and credibly both to police and in court." Id.

Similarly, in the present case, once Shores was bludgeoned and lay nearly unconscious with his hands and feet bound, he was incapable of thwarting Rafsky and Wood from robbing him and escaping. The similarities end there, though.

Unlike the victim in Willacy, Shores did not know Rafsky or Wood and only possessed the license plate number of the stolen Jeep that Rafsky was driving as a possible identifier. As this Court has explained, that a victim "might have been able to identify [his] assailant is not sufficient to support finding [the avoid arrest aggravating] factor." Robertson v. State, 611 So. 2d 1228, 1232 (Fla. 1993) (emphasis added).

Willacy is further distinguishable from the present case because the "facts supporting commission of [the] murder to avoid arrest . . . focus[ed] on [Willacy's] motivation for the crime." Looney, 803 So. 2d at 676. In the present case, "[t]he State failed to show any other facts that would establish that [Wood's] dominant motive was to eliminate" Shores as a witness. Robertson, 611 So. 2d at 1232. Rather, the facts that support the avoid arrest aggravating factor are specific to Rafsky, not Wood. The factual finding that "focus[ed] on [Wood's] motivation for the crime," Looney, 803 So. 2d at 676, is that Wood stood over Shores striking matches after a flammable liquid was poured on him. As we have already explained, this factual finding was not supported by competent, substantial evidence. The other factual finding that the trial court relied upon for this aggravating factor was that "Defendants used the victim's shotgun to inflict a lethal gunshot to his skull," after the victim had been bound. (Emphasis added.)

However, the trial court also found that it was highly unlikely that Wood was the actual shooter, which the State conceded at trial.

Applying the legal standard to the facts of this case, the avoid arrest aggravating factor cannot stand. The facts adduced at trial established that Wood and Rafsky became stuck on Shores' property after the Jeep that Rafsky was driving became bogged down in the mud in front of the house on the property. The two then proceeded to "plunder" the house, where they ingested methamphetamine before attempting to extract the Jeep. When Shores arrived, he asked the two to leave his property. After Shores wrote down the license plate number of the Jeep, Shores walked around the house and, according to Wood, Rafsky followed and attacked Shores with a garden hoe. Thereafter, Rafsky enlisted Wood to help him bind Shores, which Wood did by wrapping an old shirt around Shores' legs. Wood then punched Shores, and Rafsky poured some type of flammable liquid on Shores and instructed Wood to "catch the old man on fire." According to Wood, he pretended that the matches would not light and threw them to the ground. Although Wood's statement to investigators and his testimony at trial differ as to the sequence of events that occurred next, in either version it is clear that Wood was not near Rafsky when Rafsky shot Shores. According to one version of Wood's account, Wood walked back to the front of the house and began to take the license plate off of the Jeep when he heard the sound of a gunshot. His later

testimony at trial indicated that the pair were already in Shores' Camry and leaving the property after beating and restraining Shores when Rafsky stopped the car, got out, walked to the victim, and shot him in the head.

We have previously struck the avoid arrest aggravating factor in situations where the defendant actually pulled the trigger and "shot instinctively, not with a calculated plan to eliminate [the victim] as a witness." Cook v. State, 542 So. 2d 964, 970 (Fla. 1989). Here, where there is a lack of evidence that Wood actually pulled the trigger, much less knew that Rafsky intended to shoot Shores after the pair restrained him, it is clear that the avoid arrest aggravator was applied vicariously. We previously held in Copeland v. State, 457 So. 2d 1012 (Fla. 1984), that this aggravating factor "may be imputed to [a defendant] even though his liability for the murder itself is vicarious." Id. at 1019. However, "we noted [in Copeland] that the defendant was an equal participant in the hours-long ordeal that involved the defendant initially confronting the victim at gunpoint, the kidnapping of the victim, and ending with her eventual rape and execution-style murder carried out with the defendant's gun." Perez v. State, 919 So. 2d 347, 380 (Fla. 2005) (refusing to apply the heinous, atrocious, and cruel (HAC) aggravating factor vicariously, even though such aggravator was applied vicariously in Copeland, because of distinguishable facts).

As we explained in striking the CCP aggravating factor, because there is an absence of similar culpable facts evidencing that Wood knew Rafsky intended to shoot Shores, there is also a lack of evidence that Wood intended to murder Shores for the sole purpose to avoid arrest. Accordingly, we conclude that the evidence does not support the application of this aggravating factor vicariously to Wood. There is a lack of competent, substantial evidence establishing that the dominant motive of Wood's participation in the murder of Shores was to avoid arrest. Accordingly, we are compelled to strike this aggravating factor.

## C. Trial Court's Rejection of Mitigating Circumstances

Wood next claims that the trial court erred in rejecting the mitigating circumstances of his drug and alcohol abuse, as well as his remorse. Trial court findings on mitigation are reviewed for an abuse of discretion. Foster v. State, 679 So. 2d 747, 755 (Fla. 1996).

After detailing Wood's "extensive drug use" and abuse of alcohol, the trial court concluded that Wood's mitigating circumstance of drug and alcohol abuse "has not been proven, and the Court assigns no weight thereto." This Court has "repeatedly stated that whenever a reasonable quantum of competent, unconverterted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved . . . A trial court may only reject the proffered mitigation if the record evidence provides competent, substantial

evidence to the contrary." Mahn v. State, 714 So. 2d 391, 400-01 (Fla. 1998) (citing Spencer v. State, 645 So. 2d 377, 385 (Fla. 1994)) (internal quotation omitted).

Based on this standard, Wood is correct that the trial court erred in finding that his drug and alcohol abuse had not been proven as a mitigating circumstance. The trial court's sentencing order recounted the testimony of Wood's family and Wood himself regarding Wood's drug and alcohol abuse and found that such testimony "demonstrate[s] defendant's extensive drug use," including his use of methamphetamine, pain pills, alcohol, and other prescription drugs. The trial court found that Wood's "drug abuse was evident on the date of Shores' murder. Both he and Rafsky were eating methamphetamine just before they were discovered by James Shores." However, because the trial court found "no evidence to suggest Wood's continued drug abuse lessens his moral culpability, . . . made him participate in the murder," or "caused any mental deficiencies tending to mitigate his role in the murder," the trial court found this mitigating circumstance was not proven.

This Court has previously found error where drug and alcohol abuse has been rejected as mitigating because the defendant was not under the influence of drugs or alcohol during the crime. As this Court explained in Mahn:

> In Ross v. State, 474 So. 2d 1170, 1174 (Fla. 1985), we found the defendant's past drinking problems, among other things, to be

- 28 -

> "collectively . . . a <u>significant</u> mitigating factor" even though the defendant himself testified he was "cold sober" on the night of the murder. <u>Accord</u> <u>Penn v. State</u>, 574 So. 2d 1079 (Fla. 1991) (defendant's heavy drug use was significant mitigation); <u>Songer v. State</u>, 544 So. 2d 1010, 1011 (Fla. 1989) (finding several mitigating circumstances "particularly compelling," including unrebutted evidence defendant's "reasoning abilities were substantially impaired by his addiction to hard drugs").

<u>Mahn</u>, 714 So. 2d at 401. In this case, there was unconverted evidence of Wood's extensive drug and alcohol abuse leading up to the murder, as well as his use of methamphetamine directly preceding the murder. Accordingly, the trial court erred in failing to find that this mitigating circumstance was proven.

Regarding Wood's claim that the trial court erred in not finding Wood's remorse as a mitigating circumstance, we recently explained that in "order to challenge on appeal the trial court's decision about a nonstatutory mitigating factor, the defendant must raise that proposed nonstatutory mitigating circumstance before the trial court." <u>Gonzalez v. State</u>, 136 So. 3d 1125, 1165 (Fla. 2014) (citing <u>Lucas v. State</u>, 568 So. 2d 18, 24 (Fla. 1990)). Wood did not raise his remorse as a proposed nonstatutory mitigating circumstance before the trial court, and it was not otherwise asserted during the penalty phase. Accordingly, Wood cannot now challenge the trial court's finding regarding this nonstatutory mitigating circumstance.

### D. Harmless Error Analysis

Having struck both the CCP and avoid arrest aggravating factors, we must determine whether the trial court's error in finding these aggravating factors is harmless beyond a reasonable doubt. "When this Court strikes an aggravating factor on appeal, 'the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence.' " Williams v. State, 967 So. 2d 735, 765 (Fla. 2007) (quoting Jennings v. State, 782 So. 2d 853, 863 n.9 (Fla. 2001)); accord Cole v. State, 36 So. 3d 597, 609 (Fla. 2010). In addition to the aggravating factors we have struck, the trial court found the felony-murder aggravating factor and gave it great weight. The trial court found two statutory mitigating circumstances: (1) Wood's capability of employment and contribution to the workforce (little weight), and (2) Wood's family background and abusive childhood (some weight). Additionally, the trial court found that Wood had proven the following nonstatutory mitigating circumstances: (1) the defendant had good jail conduct pending and during trial (very little weight); (2) the defendant's education (little weight); (3) the defendant has support from loving siblings and friends (little weight); and (4) the defendant's cooperation with law enforcement (little weight). We have also explained that the trial court erred in rejecting as a mitigating circumstance Wood's history of drug abuse.

Our inquiry post-Hurst must necessarily be the effect of any error on the jury's findings, rather than whether beyond a reasonable doubt the trial judge

would have still imposed death.  See Hurst, 202 So. 3d at 68.  As we explained in

Hurst,

> Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence.  See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," [State v.]DiGuilio, 491 So. 2d [1129,] 1137 [(Fla. 1986)], and the State bears an extremely heavy burden in cases involving constitutional error.  Therefore, in the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case.  We reiterate:

>> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test.  Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

> DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Id.

In this case, the jury was instructed on both aggravating factors that we have

determined were not supported by competent, substantial evidence.  This alone

would require a finding that the error was not harmless beyond a reasonable doubt.

We note that our conclusion in this regard is also consistent with our pre-Hurst

precedent in Kaczmar v. State, 104 So. 3d 990, 1008 (Fla. 2012), where we held

- 31 -

that, upon striking the CCP and felony-murder aggravating factors so that only one valid aggravating factor remained, such error was not harmless beyond a reasonable doubt. Post-Hurst, this conclusion is even more compelling.

Pursuant to Hurst, "the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances." 202 So. 3d at 53. Thus, the jury would have had to make these factual determinations that the sole valid aggravating factor—that the capital felony was committed while Wood was engaged, or was an accomplice in the commission of a burglary and or robbery—outweighed the mitigating circumstances established. "[W]e are not so sanguine as to conclude that [Wood's] jury . . . would have found [this sole aggravating factor] sufficient to impose death and that [this sole aggravating factor] outweighed the mitigation." Id. at 68. Thus, we are unable to conclude that the trial court's instruction to the jury to consider the improper CCP and avoid arrest aggravators was not harmless under Hurst and would otherwise be compelled to remand for a new penalty phase. However, because, as we next discuss, we conclude that under our general proportionality review, death is a disproportionate punishment in this case once these aggravating factors are struck, we do not remand for a new penalty phase.

### III. Proportionality

Wood contends that death is a disproportionate punishment in this case.[7] This Court performs a comprehensive proportionality analysis in cases where the death penalty has been imposed to "determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Silvia v. State, 60 So. 3d 959, 973 (Fla. 2011). "The purpose of this Court's proportionality review is to 'foster uniformity in death-penalty law.' " Hernandez v. State, 4 So. 3d 642, 672 (Fla. 2009) (quoting Tillman v. State, 591 So. 2d 167, 169 (Fla. 1991)). Accordingly, the Court "consider[s] the totality of the circumstances of the case and compare[s] the case to other capital cases." Offord v. State, 959 So. 2d 187, 191 (Fla. 2007). "This analysis 'is not a comparison between the number of aggravating and mitigating circumstances.' " Silvia, 60 So. 3d at 973 (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990)). "Rather, this entails 'a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " Id. (quoting Urbin v. State, 714 So.

---

7. Wood also argues that the death penalty is disproportionate punishment as applied to this case under Enmund v. Florida, 458 U.S. 782, 102 S. Ct. 3368 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S. Ct. 1676 (1987). Because we conclude that the issue of whether Wood's death sentence is disproportionate under this Court's general proportionality review once the CCP and avoid arrest aggravating factors are struck is dispositive, it is unnecessary to address his Enmund/Tison claim.

2d 411, 416 (Fla. 1998)). "In reviewing the sentence for proportionality, this Court will accept the jury's recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors." Id. Our proportionality review, however, requires considering the totality of the circumstances of the case, not just comparing the number of aggravating factors and mitigating circumstances. Id.; Sliney v. State, 699 So. 2d 662, 672 (Fla. 1997).

As previously discussed, we have struck the trial court's finding of the CCP and avoid arrest aggravating factors. Thus, the trial court appropriately found one aggravating factor, that the capital felony was committed while Wood was engaged, or was an accomplice in the commission of, burglary and or robbery, which it assigned great weight. We note, of course, that this aggravating factor was based on Wood's contemporaneous robbery and burglary convictions. Although we have never found that the contemporaneous conviction of a felony giving rise to a conviction for felony murder could not also provide a separate basis for an aggravating factor, the circumstances of this case make that proposition questionable. In other words, after striking the CCP and avoid arrest aggravating factors, the basis for Wood's death sentence was the sole aggravating factor that Wood committed the capital felony while committing the burglary and robbery.

In this case, the trial court found two statutory mitigating circumstances: (1) Wood's capability of employment and contribution to the workforce (little weight), and (2) Wood's family background and abusive childhood (some weight). Additionally, the trial court found that Wood had proven the following nonstatutory mitigating circumstances: (1) the defendant had good jail conduct pending and during trial (very little weight); (2) the defendant's education (little weight); (3) the defendant has support from loving siblings and friends (little weight); and (4) the defendant's cooperation with law enforcement (little weight). We have also explained that the trial court erred in rejecting as a mitigating circumstance Wood's history of drug abuse.

Reviewing the totality of the circumstances of this felony-murder case and comparable cases involving minimal aggravation and mitigation, it is evident that the death penalty is a disproportionate punishment in this case. We also consider Wood's relative culpability in light of the trial court's finding that "the facts suggest Rafsky may have fired the shotgun into the head of the victim" and the DNA evidence that establishes that Rafsky—not Wood—handled the murder weapon.

The State asserts that Wood's sentence is not disproportionate because this case is similar to Lawrence v. State, 846 So. 2d 440 (Fla. 2003), a case where the defendant did not actually commit the murder and the trial court found only two

- 35 -

aggravating factors, five statutory mitigating circumstances, and four nonstatutory mitigating circumstances. Id. at 444-45. However, Lawrence is distinguishable from the present case. In Lawrence, the defendant's accomplice shot the victim using the defendant's gun after both men had had sex with the victim. 846 So. 2d at 442. The defendant then "made an incision into [the victim's] leg and removed her calf muscle. [The co-defendant] took Polaroid pictures of the body, including a picture of [the defendant's] hand holding [the victim's] foot." Id. at 443. Investigators later found multiple notes written by Lawrence about a plan to get a woman drunk and " 'slice and dice' " her, and found "a piece of human tissue in Lawrence's freezer." Id. This Court concluded that, despite the existence of mental mitigation, Lawrence "could comprehend the consequences of his actions, and he acted with a deliberate plan to further his own gruesome personal interests." Id. at 455. The totality of the circumstances in this case does not compare to the defendant's deliberate plan in Lawrence.

Rather, we find the circumstances of this case similar to the circumstances in Yacob v. State, 136 So. 3d 539 (Fla. 2014), where the defendant killed a convenience store clerk during a robbery. Id. at 540. In Yacob, the trial court "accorded great weight to the single, merged aggravator of murder in the course of a robbery/pecuniary gain," an aggravating factor that we explained "is not typically considered especially weighty." Id. at 551. The trial court found the defendant's

age—twenty-two years old—as one statutory mitigating circumstance, which it assigned no weight, and six nonstatutory mitigating circumstances, which it "ascribed each little to no weight." Id. at 550. Considering the totality of the circumstances, we explained that "[a]lthough the mitigation [was] not substantial, we nevertheless hold that the sentence of death is disproportionate because we conclude that this case is comparable to others in which we vacated the death sentence because it was disproportionate." Id. In so holding, we noted previous cases in which we found the death penalty disproportionate:

> First, in Johnson v. State, 720 So. 2d 232, 236 (Fla. 1998), the defendant was convicted of first-degree murder based on evidence that this Court described as "sufficient to uphold the conviction based on a theory of premeditation or felony murder" during the course of a burglary. The trial court sentenced the defendant to death after finding two aggravators—a prior violent felony conviction, and the merged aggravator of committed in the course of a burglary and pecuniary gain—and ascribing substantial to slight weight to the age statutory mitigator and six nonstatutory mitigators, including troubled childhood, good son and neighbor, and earned high school equivalency certificate. Id. at 235. Although we found proportionality to be a "close question," we determined that the prior violent felony aggravator was not strong, and the totality of the circumstances, both standing alone and in comparison to similar cases, supported vacating the death sentence. Id. at 238.
> We also vacated a death sentence in Scott v. State, 66 So. 3d 923, 925 (Fla. 2011). In that case, the defendant was convicted of first-degree murder, under both the felony and premeditated murder theories, attempted armed robbery, and aggravated battery. Id. at 928. Scott planned a robbery and upon entering the business hit one man on the head with his gun and shot and killed the owner after he told Scott that he had no money. Id. at 925-26. The trial court found two statutory aggravators: a prior violent felony conviction and committed in the course of an attempted armed robbery. Id. at 928-

29.  In mitigation, the trial court found nine nonstatutory mitigating factors—including that Scott loved his family, was respectful, evidenced religious faith, and was a good surrogate father—according each slight or little weight.  Id. at 935.  We determined that under the totality of the circumstances, the aggravators—though properly found—were not particularly weighty, and concluded that comparable cases "were more aggravated and involved prior violent felony aggravators established by qualitatively different offenses, which were committed at times separate from the murder."  Id. at 936.  Moreover, the murder in Scott was more a "reactive action in response to the victim's resistance to the robbery" than a "prearranged plan."  Id. at 937.

Similarly, in Thompson v. State, 647 So. 2d 824, 827 (Fla. 1994), we vacated a death sentence where the defendant killed a store employee, and the single valid aggravator was murder in the course of a robbery.  Only nonstatutory mitigation was found, including that the defendant was a good parent and provider, exhibited no prior violent propensities, was honorably discharged from the United States Navy, had gainful employment and some artistic skill, was raised in a religious environment, and was a model prisoner.  Id. at 826 n.2; accord Sinclair v. State, 657 So. 2d 1138, 1142-43 (Fla. 1995) (vacating death sentence for murder of cab driver where single aggravator was murder in the course of robbery/pecuniary gain and three nonstatutory mitigators were found and given little to no weight but record showed mitigation of low intelligence level and emotional disturbances had "substantial weight").

Yacob, 136 So. 3d at 550-51 (emphasis added).

Like Yacob, the murder in this case "does not appear to have been a part of [a] pre-arranged robbery plan."  Id. at 552.  Both Wood and Rafsky stumbled upon the victim's property and "plunder[ed]" it.  Upon being discovered by the victim, the facts adduced at trial establish that Rafsky bludgeoned the victim, and, once the victim was incapacitated, Wood likely punched the victim and then helped Rafsky restrain the victim.  Moreover, the evidence does not establish that Wood handled

the murder weapon or inflicted the fatal gunshot. The disproportionate nature of Wood's death sentence is further underscored by what we have previously held as disproportionate in cases involving defendants who, unlike Wood, actually fired the fatal gunshot. See Williams v. State, 707 So. 2d 683, 684-86 (Fla. 1998) (death sentence for the fatal shooting of a man outside his home was disproportionate when the sole aggravating factor was that the capital felony was committed for pecuniary gain, and the court gave "substantial weight" to the sole statutory mitigating circumstance of the defendant'); Terry v. State, 668 So. 2d 954, 965-66 (Fla. 1996) (finding death sentence disproportionate in felony-murder case when it was known that the defendant shot the victim, but unknown how the shooting occurred, and the only aggravating factors were the merged pecuniary gain and felony-murder factors); Sinclair v. State, 657 So. 2d 1138, 1142-43 (Fla. 1995) (finding death sentence disproportionate based on felony-murder aggravating factor when the mitigation found was that defendant cooperated with law enforcement, had a dull normal intelligence, and was raised without a father figure); McKinney v. State, 579 So. 2d 80, 85 (Fla. 1991) (finding the death sentence disproportionate when only felony-murder aggravator was present and other mitigation was present).

Accordingly, we conclude that under the circumstances of this case, Wood's death sentence is not "the most aggravated and unmitigated of most serious

crimes," and is therefore disproportionate.  Dixon v. State, 283 So. 2d 1, 7 (Fla. 1973).

## CONCLUSION

For the reasons explained above, we affirm Wood's first-degree murder conviction.  However, because we conclude that there was a lack of competent, substantial evidence to support the trial court's findings of the CCP and avoid arrest aggravating factors, his death sentence is disproportionate when these aggravating factors are struck.  Therefore, we vacate Wood's death sentence and remand for imposition of a sentence of life without parole.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., and PERRY, Senior Justice, concur.
LEWIS, J., concurs in result.
CANADY, J., concurs as to the conviction and concurs in result as to the sentence.
POLSTON, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., dissenting.

There was competent, substantial evidence to support the aggravating factors found, but rejected by the majority.  Beating the victim senseless with a garden hoe, tying him up, and trying to set him on fire after dousing him with a petroleum product constitutes cold, calculated, and premeditated (CCP).  A unanimous jury recommendation for death is not surprising.

- 40 -

In striking CCP and the avoid arrest aggravators, the majority improperly reweighs the facts and substitutes its own view of Wood's credibility in place of the trial judge and jury. See Brown v. State, 959 So. 2d 146, 150 (Fla. 2007) ("[T]he question of evidentiary weight is reserved to the circuit court, and this Court does not reweigh the evidence. . . . The determination of the credibility of witnesses also is reserved to the trial court." (quoting Trotter v. State, 932 So. 2d 1045, 1050 (Fla. 2006))).

I would affirm, and therefore, respectfully dissent.

An Appeal from the Circuit Court in and for Washington County,
        Christopher Nida Patterson, Judge - Case No. 672014CF000137CFAXMX

Clinton Andrew Thomas, Public Defender, and Nada Margaret Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, and Berdene Bevione Beckles, Assistant Attorney General, Tallahassee, Florida,

        for Appellee